189 F.3d 971 (9th Cir. 1999)
 HELIOTROPE GENERAL, INC., on behalf of itself and all others similarly situated, Plaintiff-Appellant,
v.
FORD MOTOR COMPANY; FORD HOLDINGS INC.; FORD HOLDINGS CAPITAL CORPORATION, Defendants-Appellees.
 No. 97-56757
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 4, 1999--Pasadena, California
Decided August 30, 1999
 
 [Copyrighted Material Omitted]
 James C. Krause, Krause & Kalfayan, San Diego, California, for the plaintiff-appellant.
 George M. Newcombe, Simpson Thacher & Bartlett, New York, New York, for the defendants-appellees.
 Appeal from the United States District Court for the Southern District of California; Jeffrey T. Miller, District Judge, Presiding. D.C. No. CV-96-00872-JTM.
 Before: Cynthia Holcomb Hall, Thomas G. Nelson, Circuit Judges, and James Ware,[1] District Judge.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Heliotrope General, Inc., ("Heliotrope") appeals from the district court's order granting the defendants' motion for summary judgment and judgment on the pleadings. We have jurisdiction under 28 U.S.C. S 1291, and we affirm.
 
 FACTUAL BACKGROUND
 
 2
 In September 1989, Ford Motor Co. ("Ford") created Ford Holdings, Inc. ("FHI") for the stated purpose of acquiring, owning, and managing various insuranceand financial services assets of Ford. In order to take advantage of certain tax benefits, Ford had to satisfy two conditions: (1) Ford had to own less than eighty percent of FHI, and (2) Ford and FHI could not file a consolidated tax return for five years after Ford deconsolidated its financial services operations. In order to maintain Ford's diluted ownership interest, FHI at various times issued to the public shares of Preferred Stock.[2] Each prospectus filed with the various stock issues stated that FHI could be merged with an affiliated entity at any time without a shareholder vote, and provided that in the event of a merger shareholders would receive twenty-five dollars per share plus accumulated and unpaid dividends. Between January 20, 1993, and July 26, 1993, Heliotrope General, Inc., ("Heliotrope") purchased on the NYSE a total of 9800 shares of Series A Preferred Stock at prices ranging from $26.375/share to $27.125/share,[3] and a total of 8500 shares of Series B Preferred Stock at prices ranging from $24.875/share to $26.625/share.[4]
 
 
 3
 Eventually, the costs to Ford of separately maintaining FHI began to outweigh the benefits Ford received from its tax strategy. In April 1995, Ford's Chairman responded to analysts' questions regarding the likelihood of Ford's restructuring its financial services operations by suggesting that a restructuring was in the works. In September 1995, Ford announced that it was considering spinning off its financial operations. In October 1995, the FHI board of directors (i.e., Ford management) announced its decision to merge FHI with Ford. To that end, Ford created Ford Holdings Capital Corp. ("FHCC"), a wholly owned subsidiary of Ford, into which FHI was merged on December 31, 1995. On January 4, 1996, Heliotrope's Series A and Series B shares of FHI Preferred Stock were cashed out for $25 per share, the liquidation preference stated in each prospectus.
 
 
 4
 In May 1996, Heliotrope filed suit against Ford, FHI, and FHCC, alleging seven causes of action for losses resulting from the merger: violations of sections 11, 12(a)(2), and 15 of the Securities Exchange Act of 1933; violations of sections 10(b), including Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934; and common law claims for fraud and negligent misrepresentation. Among other allegations, Heliotrope alleged that Ford failed to disclose the tax strategy underlying the creation of FHI and failed to disclose information concerning the likelihood of a merger, omissions that artificially inflated the price of FHI Preferred Stock. Although the lawsuit was styled as a class action, the district court never certified the suit as a class action.
 
 
 5
 The defendants filed a Rule 12(b)(6) motion to dismiss all of Heliotrope's claims, which the district court[5] granted in part and denied in part. The district court determined that all three of Heliotrope's 1933 Act claims failed as a matter of law. In addition, the district court determined that two of the three bases for relief for the 1934 Act claims and the common lawclaims failed as a matter of law,[6] leaving as the sole basis for relief Ford's alleged failure to disclose its tax strategy. The district court denied the defendants' motion with respect to the 1934 Act claims and the common law claims, deciding that Heliotrope's complaint satisfied the rigorous pleading requirements for scienter. Neither party appealed that order.
 
 
 6
 Following the district court's Rule 12(b)(6) order, the case was transferred to Judge Jeffrey T. Miller, at which time Heliotrope filed an amendment to its First Amended Complaint. The defendants then filed a motion for (I) summary judgment with respect to Heliotrope's claims that Ford failed to disclose its tax strategy, and failed to disclose the five-year deconsolidation requirement in 26 U.S.C. S 1504, and (II) judgment on the pleadings with respect to Heliotrope's claim that Ford failed to disclose by 1993 information concerning the likelihood that Ford would merge FHI back into Ford in 1995. After allowing limited discovery on the issue of loss causation, an element of Heliotrope's remaining claims, the district court granted the defendants' motion for summary judgment. The district court decided that Heliotrope could not prove loss causation because all of the allegedly omitted information regarding Ford's tax strategy had entered the market by the time Heliotrope purchased shares of FHI Preferred Stock. In addition, the district court granted the defendants' motion for judgment on the pleadings, finding (1) that Ford had no duty to disclose the five-year deconsolidation requirement of 26 U.S.C. S 1504 because it was already part of the total mix of market information, (2) that Heliotrope failed to plead with particularity the circumstances that would have given rise to a duty on Ford's part to disclose preliminary merger discussions, (3) that when the duty arose Ford complied with its duty to disclose the merger negotiations, and (4) that Heliotrope could not allege any facts that showed Ford had a duty to disclose in 1993 that it was considering merging FHI into Ford in 1995. Heliotrope timely appealed from the district court's order.
 
 DISCUSSION
 I. Summary Judgment
 
 7
 Heliotrope contends the district court erred by granting the defendants' motion for summary judgment on the basis that there was no genuine issue of material fact on whether Ford's failure to disclose its tax strategy caused Heliotrope's loss. We review de novo the district court's order granting the defendants' motion for summary judgment. See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. See id. After a careful review of the record, we find no error.
 
 A. Section 10(b) & Rule 10b-5
 
 8
 Heliotrope's complaint is based upon a fraud-on-themarket theory, alleging that the market for FHI's Preferred Stock was highly efficient, incorporating all publicly available information into its market price. In a fraud-on-the-market case, an omission is actionable under section 10(b) and Rule 10b-5 "only if the [allegedly undisclosed] information has not already entered the market." See Morris v. Newman (In re Convergent Techs. Sec. Litig.), 948 F.2d 507, 513 (9th Cir. 1991). "If the market has become aware of theallegedly concealed information, `the facts allegedly omitted by the defendant would already be reflected in the stock's prices' and `the market will not be misled.' " Id. (quoting Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1114 (9th Cir. 1989)). "In such a case, the element of reliance will not be satisfied, and plaintiff's claims based on a fraud on the market theory will fail." Kaplan v. Rose, 49 F.3d 1363, 1376 (9th Cir. 1994).
 
 
 9
 In its complaint, Heliotrope claimed that Ford was required to disclose the following information: (1) FHI "had been established as a separate entity for tax-reporting purposes favorable to Ford"; (2) the tax purposes required that FHI remain as a separate existence from Ford for at least five years; (3) the tax purposes required FHI to issue preferred shares so that Ford's ownership interest in FHI would not exceed eighty percent; and (4) Ford was required to pay taxes on dividends it received from FHI.[7] We address each of these four alleged omissions below.
 
 1. Tax Purpose of Offering
 
 10
 It is undisputed that Ford's tax strategy was part of the total mix of market information prior to Heliotrope's purchases of Series A and Series B Preferred Stock. Ford introduced numerous financial analyst reports and news articles showing that FHI was formed at least in part for tax purposes. See e.g., Fitch Investors Service, Inc., Ford Motor Credit Co. -- Company Report, May 3, 1990; Beth McGoldrick, Ford Finds an Answer to the Consolidation Rule, Institutional Investor, May 1990, at 162; Miriam Benson, Minimizing the Tax Bill by Reorganizing the Company, Inv. Dealer's Dig., Jan. 15, 1990, at 16; Bear, Stearns & Co., Ford Motor Co. -Company Report, Dec. 28, 1989; Eric N. Berg, Ford Plans to Establish a New Unit, N.Y. Times, Oct. 13, 1989, at D4; Ford Organizes Financial Units, Detroit News, Oct. 13, 1989, at E1; Matthew Winkler, Ford Revamps Firm to Realize Big Tax Savings, Wall St. J., Oct. 12, 1989, at A3. Because Ford's tax strategy was part of the total mix of information reflected in the price of FHI Preferred Stock at the time Heliotrope purchased its shares, Heliotrope cannot prove that Ford's failure to disclose its tax strategy caused Heliotrope any loss[8].
 
 2. Separate Existence Requirement
 
 11
 Heliotrope's claim that Ford failed to disclose that Ford and FHI were required to maintain a "separate existence" for five years is misleading because there was no such requirement.[9] The only separate existence limitation was that Ford and FHI could not file a consolidated tax return for five years after Ford deconsolidated its financial services operations in 1989. The section of the Tax Code to which Heliotrope refers in its argument does not prohibit the FHI-FHCC merger that occurred in this case. See 26 U.S.C. S 1504(a)(3).
 
 
 12
 To the extent that Heliotrope is basing its claim on Ford's alleged failure to disclose the five-year deconsolidation provision of the Tax Code, Heliotrope's claim is without merit. Under the fraud-on-the-market theory, the market incorporatesinto a stock's price all publicly available information. See Basic Inc. v. Levinson, 485 U.S. 224, 246 (1988) ("[T]he market price of shares traded on well-developed markets reflects all publicly available information . . . ." ). The Tax Code is publicly available information, and was therefore part of the total mix of information incorporated by the market into the price of FHI Preferred Stock. Therefore, Helio- trope's argument that the experts "were in dispute as to whether this minutia of federal tax law was part of the mix of public information" is without merit.[10]
 
 
 13
 3. Maintaining Ford's Less-than-Eighty-Percent Interest
 
 
 14
 As with the deconsolidation requirement discussed above, the tax provision governing Ford's ownership interest in FHI, see 26 U.S.C. S 1504(a)(2), was publicly available information that was incorporated into the market price of FHI Preferred Stock prior to Heliotrope's purchases. In addition, it is undisputed that the market was aware that the Tax Code required Ford to maintain a less-than-eighty-percent ownership interest in FHI, which could be achieved by issuing additional shares of preferred stock. See Institutional Investor, Inc., Ford Holdings Reportedly Considers Asset Sales to Avoid Issuing Pricey Preferred, Corp. Fin. Wk., Apr. 1, 1991, at 1 ("[I]f the value of [FHI's] common -- held by Ford Motor -- increases, it has to issue more preferred."); Institutional Investor, Inc., Ford Holdings Seen Issuing More Preferred to Keep Tax Status, Corp. Fin. Wk., Sept. 10, 1990, at 1 ("To preserve its tax advantaged status, . . .[FHI] will be required to issue additional voting preferred if the value of its common stock, which is held by Ford Motor, increases . . . ."); Fitch Investors Service, Inc., Ford Motor Credit Co. -- Company Report, May 3, 1990 ("Ford will have to maintain a preferred stock level of at least 20% going forward in order to maintain the tax advantage."); Beth McGoldrick, Ford Finds an Answer to the Consolidation Rule, Institutional Investor, May, 1990, at 162 ("If the value of the common stock rises to more than 80 percent of Holdings' net worth, then the game is up. The answer is to issue more preferred stock each year, perhaps even more frequently, to maintain the target level."); Bear, Stearns & Co., Ford Motor Co. -Company Report, Dec. 28, 1989 ("Ford must monitor the fair value of [FHI] so that more than 20% is in the hands of outsiders. If the value of outside interests drops below 20%, additional voting stock may have to be sold or Ford may have to consolidate for tax purposes."). Because the market had incorporated this information into the price of FHI Preferred Stock before Heliotrope purchased its shares of Series A and B Preferred Stock, Ford's failure to disclose this information could not have caused Heliotrope's alleged loss.[11]
 
 4. Payment of Taxes on Dividends
 
 15
 It is undisputed that the market was aware that Ford was required to pay taxes on dividends it received from FHI.See Bear, Stearns & Co., Ford Motor Co. -- Company Report, Dec. 28, 1989, at 2 ("It is important to note[the accounting analysts'] observations that . . . dividends paid by Ford Holdings to Ford are taxable (unlike Ford's existing financial subsidiaries) at 6.8%."); id. at 4 ("Perhaps the biggest disadvantage, from a cash flow standpoint, is that dividends paid to Ford from [FHI] will be taxed at an effective 6.8% rate unless they are a return on capital."). Because the market had incorporated this information into the price of FHI Preferred Stock before Heliotrope made its purchases, the defen- dants' failure to disclose this information could not have caused Heliotrope's alleged loss.[12] The district court therefore did not err by granting the defendants' motion for summary judgment with respect to Heliotrope's section 10(b) and Rule 10b-5 claim.
 
 B. Section 20(a)
 
 16
 To be liable under section 20(a),[13] the defendants must be liable under another section of the Exchange Act. See 15 U.S.C. S 78t(a); Paracor Fin., Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). Because Heliotrope named as defendants in its section 20(a) cause of action only Ford and FHI, and because neither Ford nor FHI are liable under another provision of the Exchange Act, the defendants cannot be liable under section 20(a). The district court therefore did not err by granting the defendants' motion for summary judgment with respect to Heliotrope's section 20(a) claim.
 
 
 17
 C. Fraud & Deceit; Negligent Misrepresentation
 
 
 18
 To prevail on its common law causes of action for fraud and negligent misrepresentation, Heliotrope must prove a causal connection between the defendants' alleged omissions and Heliotrope's alleged loss. See Atari Corp. v. Ernst & Whinney, 981 F.2d 1025, 1030 (9th Cir. 1992). As discussed above in our analysis of Heliotrope's section 10(b) and Rule 10b-5 claim, Heliotrope cannot prove this required causal connection. The district court therefore did not err by granting the defendants' motion for summary judgment with respect to both of Heliotrope's state law claims.
 
 II. Judgment on the Pleadings
 
 19
 Heliotrope contends that the district court erred by granting the defendants' Rule 12(c) motion for judgment on the pleadings because the defendants had a duty to disclose "all material facts concerning the tax benefits and costs, and likely duration, of its tax reduction strategy."[14] We review de novo the district court's order granting the defendants' Rule 12(c) motion for judgment on the pleadings. See Nelson v. City of Irvine, 143 F.3d 1196, 1200 (9th Cir.), cert. denied, 119 S. Ct. 444 (1998). "A judgment on thepleadings is properly granted when, taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." Id. After careful review of Heliotrope's complaint, we find no error in the district court's order granting the defendants' motion for judgment on the pleadings.
 
 
 20
 Heliotrope contends that (1) due to Ford's tax position at the time of each stock issue that the defendants knew "it was no longer in [Fords'] interest to maintain[FHI] as a separate entity past the required minimum period of 5 years from the creation of [FHI]," (2) when the Series A Preferred Stock was issued, the defendants knew the tax benefits generated by the creation of FHI "had disappeared," making it likely that Ford would merge FHI back into Ford in 1995, and (3)"no information was disclosed suggesting that there was a likelihood that [FHI] would be merged out of existence . . . as early as 1995." In short, Heliotrope contends that Ford failed to disclose material information concerning the "risk of an early redemption"[15]. We find no merit in Heliotrope's position.
 
 
 21
 First, Heliotrope failed to identify in its complaint the information the defendants should have disclosed concerning the likelihood of a merger. Heliotrope fails to identify any material information concerning the likelihood of the December 1995 merger that Ford withheld from the market. Heliotrope fails to identify any documents, "including their contents, who prepared them, which officers reviewed them and from whom [Heliotrope] obtained the information," that suggests Ford possessed information in January 1993 regarding the diminishing net benefits of its tax strategy or the likelihood that FHI would be merged back into Ford as early as 1995. See Janas v. McCracken (In re Silicon Graphics Inc. Sec. Litig.), Nos. 97-16204, 97-16240, 1999 U.S. App. LEXIS 14955, at *36 (9th Cir. Aug. 4, 1999). In fact, Heliotrope effectively admits that it does not know whether this information exists when it states repeatedly in its opening brief on appeal that it needs additional discovery, and states in its reply brief on appeal that "it strains common sense to suggest that Ford Motor, a multi-billion dollar company with operations throughout the world, does no tax planning or had no idea of the relative benefits or costs of its tax strategies." As we held in Silicon Graphics, "[i]t is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [the plaintiff's] claim." Id. at *39-40. Consequently, the allegations contained in Heliotrope's First Amended Complaint, including the amendments thereto, are far too speculative to give rise to a "strong inference of intent." See id. at *34-42 (discussing 15 U.S.C. S 78u-4(b)). Heliotrope's complaint therefore fails to satisfy the rigorous pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), which require Heliotrope to "provide, in great detail, all the relevant facts forming the basis of [its] belief." See id. at *39. Therefore, the district court did not err by granting the defendants' Rule 12(c) motion for judgment on the pleadings.[16]
 
 
 22
 In addition to the alleged omissions contained in its complaint, Heliotrope identifies for the first time in its opening brief on appeal additional factors that it claims the defendants should have disclosed: (1) the dollar amount of the tax benefits generatedby the tax strategy, and (2) the relative costs and benefits of maintaining the tax strategy. Because these alleged omissions were not part of Heliotrope's complaint, we decline to address them on appeal. See Fed. R. Civ. P. 12(c); Nelson v. City of Irvine, 143 F.3d 1196, 1200 (9th Cir.) ("A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." (emphasis added)), cert. denied, 119 S. Ct. 444 (1998).
 
 
 23
 Even if Heliotrope's complaint had alleged these omissions, however, the complaint still would have failed to satisfy the pleading standards of the PSLRA. Again, Heliotrope fails to identify any documents, "including their contents, who prepared them, which officers reviewed them and from whom [Heliotrope] obtained the information," that show Ford possessed information regarding the actual costs and benefits of its tax strategy. See Silicon Graphics, 1999 U.S. App. LEXIS 14955, at *36. Nor does Heliotrope's complaint, considered in its entirety, state facts that create a strong inference of the required degree of intent. See id. at *41-42. As discussed above, the generic allegations raised in Heliotrope's opening brief on appeal are insufficient to state a valid claim under the PSLRA. See id. at *36, *50. Therefore, even if we were to consider the additional allegations contained in Heliotrope's opening brief on appeal, we would still affirm the district court's order granting the defendants' motion for judgment on the pleadings.
 
 
 24
 In addition, even if Heliotrope's complaint could survive the PSLRA's pleading requirements, the complaint could not survive the defendants' motion for judgment on the pleadings because the defendants had no duty to disclose any of the allegedly undisclosed information. First, Ford was not required to disclose the dollar amount of the tax benefits or the relative costs and benefits of maintaining the tax strategy. See Morris v. Newman (In re Convergent Techs. Sec. Litig.), 948 F.2d 507, 516 (9th Cir. 1991) ("The securities laws do not require management `to bury the shareholders in an avalanche of trivial information--a result that is hardly conducive to informed decisionmaking.' " (quoting TSC Industries, Inc v. Northway, Inc., 426 U.S. 438, 448-49 (1976))). Despite Heliotrope's argument to the contrary, we were unable to find any securities law provision requiring the tax disclosures that Heliotrope claims were required.[17]
 
 
 25
 Second, Ford had no duty to disclose internal financial projections regarding the expected dollar values of tax costs and benefits, the date on which the tax-strategy benefits were expected to be outweighed by its costs, or the date on which a merger was most likely. See 17 C.F.R.S 229.10(b) (giving management the option to disclose "projections of future economic performance," but not requiring that disclosure); Silicon Graphics, 1999 U.S. App. LEXIS 14955, at *51; Convergent Techs., 948 F.2d at 516 (holding no duty to disclose internal projections or progress in implementing new mechanization structure); Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1221 (9th Cir. 1980) ("The SEC does not require a company to disclose financial projections."); see also Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992) (holding no disclosure required when event is contingent or speculative in nature).
 
 
 26
 Third, the record shows that the market was aware of the mounting costs associated with the tax strategy,from which the market could have inferred that the strategy might one day be abandoned as too costly.[18] See Institutional Investor, Inc., One Year Ago in Corporate Financing Week, Corp. Fin. Wk., Sept. 9, 1991, at 9 ("[D]ue to high dividend rates on its outstanding issues[, FHI] reportedly considered selling assets as an alternative [to issuing additional Preferred Stock]."); Institutional Investor, Inc., Ford Holdings Reportedly Considers Asset Sales to Avoid Issuing Pricey Preferred, Corp. Fin. Wk., Apr. 1, 1991, at 1 (discussing partial asset sale as alternative to issuing additional preferred stock due to high dividend rates required by preferred stock); Institutional Investor, Inc., Ford Holdings Pays Up to Reprice Preferred for Five Years, Corp. Fin. Wk., Oct. 29, 1990, at 2 ("The holding company, however, did not anticipate the high rate it would be forced to pay . . . ." ); see also Matthew Winkler, Ford Revamps Firm to Realize Big Tax Savings, Wall St. J., Oct. 12, 1989 (stating "[t]here may be some tax benefits and there may be some tax detriments," and the "costs and benefits depend very much on complex considerations specific to [FHI]").
 
 
 27
 Finally, despite Heliotrope's argument to the contrary, Sanders v. Devine, No. CIV-A-14679, 1997 WL 599539 (Del. Ch. Sept. 24, 1997), is on point and involves the same set of underlying facts that form the basis of Heliotrope's claim. In Sanders, the plaintiff alleged common law claims for fraud and negligent misrepresentation[19] based in part on Ford's failure to disclose that "there was a risk to investors that after expiration of the five year period, Ford would reconsolidate Ford Holdings and thereby effectively redeem the Depositary Shares." Id. at *3. The court granted Ford's motion to dismiss for failure to state a claim, deciding that the plaintiff had failed to allege even a prima facie case for either of his tort claims:
 
 
 28
 In the present case, the Prospectus could not state any more clearly the conditions under which a stock- holder's interest could terminate. It is true that the Prospectus states that the Shares are non redeemable. However, it is equally true, as is evidenced by reading the text immediately following the statement that the Shares are non-redeemable, that the Shares were subject to a cash-out merger "at any time." Therefore, to the extent plaintiff alleges that he formed a misunderstanding of the material facts surrounding the issuance of the Shares, including the likelihood that they would be cashed out in the future, plaintiff's misunderstanding is not a reasonable one in light of the disclosures actually made by the defendants . . . .
 
 
 29
 . . . .
 
 
 30
 Boiled down to their essence, the crucial allegations contained in . . . the Amended Complaint are that, if read to allow the understanding alleged by plaintiff that the Shares would remain outstanding forever, the Prospectus misled investors by not disclosing information about Ford's tax strategy which would have put them on notice that "there was a risk" that after 1994 "Ford would reconsolidate Ford Holdings and thereby effectively redeem" the Shares. As pointed out, supra, the Amended Com plaint makes this allegation plausible only by ignoring altogether the Prospectus' disclosure about the possibility of a cash-out merger.
 
 
 31
 When viewed in light of the clear and repeated disclosure about the possibilityof a cash-out merger, the alleged omissions . . . are immaterial as a matter of law.
 
 
 32
 Id. at *7-8. The court's reasoning in Sanders is apposite to the claims at issue in this appeal.
 
 
 33
 Ford disclosed in each prospectus that FHI could be merged into an affiliated entity at any time without shareholder approval for twenty-five dollars per share of Series A and B Preferred Stock. Heliotrope purchased shares of Series A and B Preferred Stock in an efficient market, and collected dividends--two dollars per share annually--for over two years before Ford merged FHI into FHCC. As promised, Heliotrope was cashed out in the merger for twenty-five dollars per share. Ford's disclosure of the potential for the merger could not have been clearer.
 
 CONCLUSION
 
 34
 Based on the foregoing, we affirm the district court's order granting the defendants' motion for summary judgment and judgment on the pleadings.
 
 
 35
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable James Ware, District Judge for the Northern District of California, sitting by designation.
 
 
 [2]
 In October 1989, Ford sold $800 million of FHI Preferred Stock in private sales to institutional investors. In June 1992, FHI issued $286 million of Series A Preferred Stock. In January 1993, FHI issued $173 million of Series B Preferred Stock. In August 1993, FHI issued $200 million of Series C Preferred Stock. In August 1994, FHI issued $200 million of Series D Preferred Stock. FHI issued its shares of Preferred Stock as depositary shares, each of which is the equivalent of 1/4000 of an actual share of Preferred Stock. Each depositary share was initially sold for $25/share, and had a liquidation preference of $25/share.
 
 
 [3]
 Heliotrope purchased 2000 shares of Series A Preferred Stock on April 26, 1993; 4000 shares on May 13, 1993; 2500 shares on May 21, 1993; and 1300 shares on July 26, 1993.
 
 
 [4]
 Heliotrope purchased 2000 shares of Series B Preferred Stock on January 20, 1993; 400 shares on May 12, 1993; 3600 shares on May 13, 1993; 1500 shares on May 20, 1993; and 1000 shares on May 21, 1993.
 
 
 [5]
 Judge Barry Ted Moskowitz decided Ford's Rule 12(b)(6) motion.
 
 
 [6]
 Heliotrope had claimed that Ford misrepresented in the prospectus that (1) the Preferred Shares were nonredeemable when they were effectively redeemable through a merger, and (2) FHI would be maintained indefinitely as a separate entity because the financial disclosures indicated it was a successful company. The first claim failed because the shares were not redeemed, but instead were cashed out at $25 per share in a merger, which each prospectus stated could happen at any time. The second claim failed because the financial disclosures were accurate and reliable, and the prospectus stated that FHI could merge at any time, precluding any inference that FHI's existence would be indefinite.
 
 
 [7]
 In addition, Heliotrope claimed that Ford failed to disclose information suggesting that there was a likelihood that a merger would occur as early as 1995. Because this portion of Heliotrope's complaint was addressed under Ford's Rule 12(c) motion, we address this alleged omission below in Part II of this opinion.
 
 
 [8]
 Heliotrope's argument that the district court misconstrued its claim by failing to recognize that Heliotrope was alleging that the tax strategy was Ford's only purpose for creating FHI is without merit. Heliotrope's complaint does not contain this limitation, and instead states only that tax considerations were the "primary purpose" for the Preferred Stock offerings.
 
 
 [9]
 Heliotrope also stated on appeal that Ford executed the FHI merger as soon as the five-year deconsolidation period expired. However, the fiveyear period ended on December 31, 1994, and the FHI merger was conducted on December 31, 1995, one year after the"5 year bar ran." Heliotrope's characterization of the timing of the merger is therefore incorrect.
 
 
 [10]
 Even if we were to hold otherwise, Heliotrope's own expert testified that the provisions of the Tax Code referenced in the articles submitted by the defendants were part of the publicly available information incorporated into the stock price. Numerous articles submitted by the defendants referred to the section of the tax code containing the five-year deconsolidation requirement. See Bear, Stearns & Co., Ford Motor Co. -- Company Report, Dec. 28, 1989; Beth McGoldrick, Ford Finds an Answer to the Consolidation Rule, Institutional Investor, May, 1990, at 162; Associated Press, Ford Sells Off Rouge Steel, Creates Holding Company, L.A. Times, Oct. 13, 1989, at D4; Matthew Winkler, Ford Revamps Firm to Realize Big Tax Savings, Wall St. J., Oct. 12, 1989, at A3. Therefore, this alleged dispute of expert testimony would not warrant reversal. See Binder v. Gillespie, 184 F.3d 1059 (9th Cir. July 26, 1999); Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1116 (9th Cir. 1989).
 
 
 [11]
 In addition, Heliotrope's statement that Ford was required to issue new shares of Preferred Stock to maintain its diluted ownership interest in FHI is incorrect. Instead of issuing new shares, Ford could have sold assets.
 
 
 [12]
 In addition, we find no merit in Heliotrope's claim that the decline invalue of FHI Preferred Stock demonstrates loss causation. The decline in the stock price to $25 per share indicates only that Ford announced its plan to merge FHI back into Ford. Because the market knew that shareholders were entitled to $25 per share in the event of the recently announced merger, it was no surprise that the price of FHI Preferred Stock began to move toward the liquidation preference price when Ford announced the merger.
 
 
 [13]
 Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C.S 78t(a).
 
 
 [14]
 To the extent that Heliotrope's claim relies on the defendants having had a plan in January 1993 to merge FHI into a wholly owned Ford subsidiary as soon as the five-year deconsolidation period expired, Heliotrope admits in its reply brief that it "has not alleged defendants had a `plan' in 1992 that they would merge in 1995." We therefore need go no further with respect to this argument.
 
 
 [15]
 Heliotrope's "redemption " argument was dismissed by Judge Moskowitz in the district court's order granting in part the defendants' Rule 12(b)(6) motion. Heliotrope's continued reliance on this mis-characterization of the merger is therefore without merit. Ford did not redeem any of the shares, but instead cashed them out through a merger that Ford disclosed could occur at any time without shareholder approval.
 
 
 [16]
 Heliotrope contends that Judge Moskowitz's ruling on the defendants' Rule 12(b)(6) motion requires us to reverse the district court's order. However, Silicon Graphics had not been decided when Judge Moskowitz ruled that Heliotrope's complaint satisfied the pleading standards of the PSLRA. That ruling is incorrect as a matter of law under Silicon Graphics.
 
 
 [17]
 Heliotrope contends that Items 503 and 504 of Regulation S-K, 17 C.F.R. S 229.503, 504, require these disclosures. We were unable to find within these provision any such requirement. In addition, Heliotrope contends for the first time in its reply brief that Item 303 of Regulation S-K, 17 C.F.R. S 229.303(a)(3)(ii), required Ford to disclose the "current trend concerning the net benefits and costs of its tax strategy." Heliotrope waived this argument by failing to raise the argument in its opening brief on appeal. See McMillan v. United States, 112 F.3d 1040, 1047 (9th Cir. 1997).
 
 
 [18]
 When considering a motion for judgment on the pleadings, this court may consider facts that "are contained in materials of which the court may take judicial notice." See Barron v. Reich , 13 F.3d 1370, 1377 (9th Cir. 1994) (citations omitted). We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants. See Fed. R. Evid. 201; Basic Inc. v. Levinson, 485 U.S. 224, 244-47 (1988) (discussing and adopting fraud on the market theory).
 
 
 [19]
 Heliotrope's statement that Sanders involved only claims for "breach of the covenant of good faith and fair dealing and breach of fiduciary duty" is incorrect. See Sanders, 1999 WL 599539, at *6-7.