**In re The VANTIVE CORPORATION SECURITIES LITIGATION and Related and Consolidated Actions Nos. C–99–3403 WHO and C–99–3883 WHO**

**No. C–99–3248 WHO.**

United States District Court,
N.D. California.

May 19, 2000.

Alan Schulman, Edward P. Dietrich, Darrent J. Robbins, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Paul J. Geller, Shepherd & Geller, Boca Raton, FL, Reed R. Kathrein, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Francisco, CA, for plaintiff Ken Webb, on behalf of himself and all others similarly situated.

Gregory Nespole, Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, for plaintiff Park East Inc., on behalf of itself and all others similarly situated.

Howard D. Finkelstein, Jeffrey R. Krinsk, Arthur E. Schingler, Finkelstin & Krinsk, San Diego, CA, for plaintiff Peter Rodes, on behalf of himself and all others similarly situated.

Shirli Fabbri Weiss, Robert W. Brownlie, Mark H. Hamer, Gray, Cary, Ware & Freidenrich, San Diego, CA, Susan d. Resley, Kim E. Levy, Gray, Cary, Ware & Freidenrich, Palo Alto, CA, for defendants The Vantive Corporation, John R. Luongo, John M. Jack, Kathleen A. Murphy, Christopher W. Lochhead, Roger J. Sippl, David J. Jodoin, Michael M. Loo.

## OPINION AND ORDER

ORRICK, District Judge.

This securities fraud class action arises out of three suits originally brought by plaintiffs Ken Webb, Peter Rodes, and Park East, Inc. against The Vantive Corporation ("Vantive") and individual defendants John R. Luongo (former CEO[1] of Vantive), John M. Jack (former COO[2] of Vantive), Kathleen A. Murphy (former CFO[3] of Vantive), Christopher W. Lochhead (former Vice President ("VP") of Vantive), Roger J. Sippl (founder and former chairman of Vantive), David J. Jodoin (former VP of Vantive), and Michael M. Loo (former VP and former interim CFO of Vantive) (collectively "the individual defendants"[4]). The Court consolidated the actions for all purposes, and appointed the Gilman Group of shareholders as lead plaintiff. Vantive now moves to strike or dismiss plaintiffs' third pleading, the first consolidated amended complaint ("FCAC"). Plaintiffs move to amend their allegations *nunc pro tunc* and to strike

---

**1.** The acronym "CFO" stands for Chief Executive Officer.

**2.** The acronym "COO" stands for Chief Operating Officer.

**3.** The acronym "CFO" stands for Chief Financial Officer.

**4.** Hereinafter, all references to "Vantive" and "defendants" will refer to the individual defendants and the Vantive Corporation collectively unless otherwise specified.

excerpts of conference call transcripts submitted by defendant. For the reasons set forth hereinafter, plaintiffs' motion to amend its allegations *nunc pro tunc* is granted, and plaintiffs' motion to strike excerpts of conference call transcripts is denied. Defendants' motion to strike is denied, and defendants' motion to dismiss is granted with prejudice.

## I.

The facts are summarized from the FCAC. This action is brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78k(a), and Rule 10(b)–5 thereunder. Plaintiffs allege violations of the Exchange Act on behalf of a class of investors who bought Vantive stock between April 23, 1997 and July 6, 1998 (the "class period").

Vantive sells and services customer relationship management software (called "front-office software") that enables field personnel to deliver customer service across many channels, including the Internet, a call center, or in person.

Vantive went public in August 1995 at $6 per share. Enjoying rapid sales and earnings growth, Vantive's stock price increased to more than $35 per share by late 1996. In April 1997 (the beginning of the class period), however, Vantive's stock price dropped to $14 ¾ per share as two competitors announced disappointing results; many believed that this particular software sector had peaked.

Plaintiffs allege that beginning in April 1997, defendants made knowingly false and misleading statements about Vantive's products' competitive prospects and the growth of its sales force, and falsely forecasted increased revenues for 1998 and 1999. Plaintiffs also allege that the individual defendants caused Vantive to manipulate and falsify its publicly reported financial results by prematurely recognizing millions in revenues by recording revenue on software licenses to resellers even though the resellers were not obligated to pay for those licenses unless and until they sublicensed the product to the ultimate end user. Allegedly, as a result of these misrepresentations, Vantive's stock soared to $39. During the class period, Vantive allegedly made two acquisitions by issuing 874,000 shares of its common stock and selling $60 million in debt securities to raise capital, while the individual defendants sold 1.39 million shares of their Vantive stock at as high as $31 per share (for a total of roughly $36 million in insider trading proceeds). After this alleged insider "bailout," Vantive's chairman (Roger Sippl) and its CFO (Kathleen Murphy) resigned.

Finally, on July 6, 1998, Vantive revealed that its results for the 1998 second quarter would be worse than earlier forecast, that Vantive was appointing a new head of North American sales, and that it was going to reduce the size of its direct sales force. Analysts slashed the 1998 revenue and earnings per share ("EPS") forecast for Vantive. Vantive's stock fell to as low as $11, and has performed poorly ever since.

On July 6, 1999, one year after the end of the alleged class period, shareholders filed three virtually identical complaints against Vantive and the individual defendants. Vantive filed a motion to dismiss all three of the complaints. The three original plaintiffs amended their complaints. Vantive filed motions to dismiss the first amended complaints on October 5, 1999, and plaintiffs filed a motion to consolidate the cases and appoint a lead plaintiff. On October 19, 1999, the Court consolidated the three individual cases and appointed the Gilman Group as lead plaintiff in this action. At the hearing on the motions, the Court permitted plaintiffs to file a consolidated complaint, and allowed defendants' already-filed briefing on its

motion to dismiss the first amended complaints to stand.

On November 15, 1999, plaintiffs filed their reorganized,[5] 102–page FCAC, which includes numerous additional pages of allegations.[6] The allegations in the FCAC are pled on information and belief. Defendants filed a third motion to dismiss the FCAC [7] that the Court now grants.[8]

**5.** The FCAC is organized in such a way that it repeats part or all of a list of allegations about allegedly concealed facts. This list appears in four places in the complaint. (*See* FCAC ¶¶ 46(a)–(q), 60(a)–(q), 76(a)–(x), 93(a)–(w), 112(a)–(j).)

**6.** Defendants estimate that the FCAC contains thirty additional pages of new allegations.

**7.** Vantive also filed a motion to strike the FCAC on the ground that it violates Rule 15 of the Federal Rules of Civil Procedure because it constitutes a second amended complaint filed without leave of court. It is apparent from the Court's comments at the hearing on the motion to consolidate the cases and from the Order filed October 19, 1999, that the Court gave permission to file a consolidated complaint, but did not grant leave to amend the complaint. The reality, however, is that plaintiffs did amend the complaint in the process of consolidating it, and defendants' new motion to dismiss the FCAC is fully briefed and before the Court. Presumably plaintiffs would not have added the extensive new material included in the FCAC unless it made their complaint stronger. Plaintiffs have now had three opportunities to plead their best case. Accordingly, in the interests of economy, Vantive's motion to strike the FCAC is denied, and plaintiff's motion to amend its complaint *nunc pro tunc* is granted.

**8.** Defendants' request for judicial notice of documents referenced in and/or relied upon in the FCAC, with the exception of the transcripts of conference calls submitted by defendants, is also granted. Vantive seeks judicial review of (1) eight press releases, portions of which are quoted in the FCAC; (2) transcripts of investor conference calls paraphrased in the FCAC; (3) statements in forty-six independent securities analysts' reports that allegedly contain information supplied by defendants; and (3) Forms 4 and other SEC filings for each Vantive officer and director that form the basis for plaintiffs' allegations that these insiders sold their Vantive stock at artificially inflated prices.

In deciding a Rule 12(b)(6) motion to dismiss, courts may consider "documents whose

## II.

## A.

### 1.

Plaintiffs' allegations in the FCAC fall into four general categories: (1) Vantive manipulated its financial results, (2) Vantive made false and misleading statements

contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading...." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994), *cert. denied*, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). Accordingly, the press releases, analyst reports and SEC documents alleged in the FCAC (and the SEC forms referenced in the press releases) are properly subject to judicial review at this stage of the litigation. *Id.* The question of whether the Court may review the conference call transcripts, however, merits closer examination.

The FCAC refers to four conference calls between the officers/directors and investors on four specific dates, and it quotes and paraphrases certain portions of the conference calls, including Murphy's statement that "[W]e *may* make forward-looking statements," (FCAC ¶¶ 38, 50, 66, 80), and various rosy statements about company productivity. The FCAC thus references the statements made in the calls themselves and not the transcripts of the calls. Plaintiffs question the authenticity of the transcripts. Vantive urges the Court to review the transcripts because they allegedly demonstrate that the allegations of the FCAC do not accurately reflect the statements made in the calls, and because they show that defendants' statements were actually accompanied by meaningful safe harbor warnings.

A review of the transcripts reveals that defendants primarily seek to include them to challenge the accuracy of the allegations in the FCAC rather than to demonstrate the existence of the safe harbor warnings. In fact, the transcripts are accompanied by an eleven page document prepared by defense counsel that purports to compare the specific allegations in the FCAC with the statements actually made by defendants during those conference calls. This is not proper evidentiary material for the Court to consider at this stage. The motion for judicial review as respects the conference call transcripts is, therefore, denied, and the balance of the motion is granted.

about the expansion of its sales force, (3) Vantive made false and misleading statements concerning its sales force automation product, and (4) Vantive made false and misleading statements about its indirect sales channels.[9] All of these statements were allegedly made despite defendants' knowledge that Vantive could not possibly fulfill its rosy financial forecasts. The FCAC also alleges that the individual defendants engaged in suspicious insider trading. These categories are described in more detail below.

The FCAC first alleges that the individual defendants manipulated Vantive's publicly reported financial results for the first quarter 1997 and all of its results during the class period. (FCAC ¶ 9.) During this time, Vantive reported strong revenue growth and strong license revenue; much of the license revenue was attributable to Vantive's recognizing revenue through its resellers. (*Id.* ¶ 118.) Plaintiffs allege that the financial results were false because Vantive "secretly" changed its revenue recognition policy with respect to software licenses sold to resellers. Thus, when Vantive management told analysts in July 1998 that Vantive had expected more from one of its resellers that did not materialize, they allegedly knew that the contract had already been "bled dry" of revenue from their aggressive revenue recognition practices during the class period. (*Id.* ¶ 126.)

Second, plaintiffs allege that Vantive made false and misleading statements about the expansion of its sales force. Vantive allegedly represented that, notwithstanding a tight labor market, it was rapidly hiring large numbers of qualified personnel for its direct sales force, and was successfully training them so that they were productive within six months of hiring. (*Id.* ¶ 4.) Specifically, defendants represented that Vantive's success was due to its growing the field sales force over 30 percent in one quarter, that the turnover

in the sales force was about 10 percent, that the force was staffed by more than sixty sales professionals, and that the company had met its goals for revenue and sales force growth. (*Id.* ¶¶ 37, 39, 49, 56, 79.) These statements were allegedly false when made because Vantive was not able to hire a sufficient number of qualified people (and was therefore hiring unqualified people); allegedly, the sales force turnover rate actually exceeded 25 percent. By mid–1997, Vantive had lost "virtually all" the experienced and productive sales personnel who had been with the company at the time of its 1995 IPO. (*Id.* ¶¶ 46(a), 60(a).)

Vantive also allegedly misrepresented its success with its sales force automation product. Vantive represented that it had successfully introduced its sales force automation product and was successfully competing in the market because its sales force automation products were superior to competitive products. Plaintiffs allege that the product was actually so unsuccessful that Vantive had quietly "pulled" the product and told sales personnel to use it as a demonstration only in an attempt to persuade customers to await the release of the new version of the product later in 1998. (*Id.* ¶ 8(c).)

Finally, Vantive allegedly assured analysts and investors that it was successfully expanding its indirect sales channels, including successful new partnerships with HBOC, Learning International, EDS and Lucent.[10] For example, defendants represented that a large deal with EDS would generate $19 million in revenue from the second quarter 1997 through the end of 1998 and that Lucent was starting to resell Vantive "Help–Desk" and "Call–Center" products that would likely generate "millions" in revenues in 1998–1999. (*Id.* ¶ 6.) Plaintiffs allege that Vantive knew the EDS deal was not worth $19 million, and that its Help Desk product manager in

---

9. For a list of examples of statements alleged to be false and misleading, see Appendix A.

10. The FCAC does not provide the full names of these business entities. (*See, e.g.,* ¶ 6.)

charge of working directly with EDS had resigned, which would greatly hinder development efforts and adversely impact the revenue Vantive would recognize under the EDS agreement. (*Id.* ¶¶ 93(n), (t), 114–128.)

2.

■ To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege facts establishing the following elements "in connection with the purchase or sale of a security": (1) a false statement or omission of material fact made by the defendant, (2) with scienter, (3) upon which plaintiff justifiably relied, and (4) the reliance proximately caused damage to the plaintiff. *McCormick v. Fund American Cos.*, 26 F.3d 869, 875 (9th Cir.1994).

The scienter pleading requirement imposed by the Private Securities Litigation Reform Act ("PSLRA") is a stringent one. The Ninth Circuit interpreted the scienter pleading standard in *In re Silicon Graphics, Inc. Securities Litigation.* 183 F.3d 970 (9th Cir.1999).[11] In *Silicon Graphics,* plaintiffs alleged that the company ("SGI") and six of its officers made a series of misleading statements or withheld information to inflate the value of SGI's stock while they engaged in insider trading, realizing nearly $14 million. Plaintiffs alleged that an internal memorandum showed that the company's product was not shipping in volume, that sales were slow in North America and Europe, and that SGI would not meet its revenue and growth targets. Plaintiffs contended that these reports notified officers that SGI was suffering, but the officers did not disclose the information to the public. Rather, the officers allegedly entered into a "conspiracy of silence" whereby they agreed to downplay the seriousness of SGI's problems while they sold their stock.

The Ninth Circuit concluded that these allegations and those of insider trading during the fifteen-week class period did not suffice to adequately allege scienter. The Ninth Circuit held that "a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id.* at 974.

■ This "deliberate recklessness" standard applies to allegedly misleading statements made by company officials that are not forward looking. The Regulations promulgated under the Reform Act define "forward-looking" statements as those containing financial projections or the management's plans and objectives for future operations. 17 C.F.R. § 240.3b–6. In addition to this "deliberate recklessness" threshold, the PSLRA creates a safe harbor for statements that are forward-looking statements. A defendant is not liable for statements identified as forward looking if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). Even if no cautionary statements were made, plaintiffs must plead facts showing that when the forward-looking statement was made, defendants had "actual knowledge" it was false. *Id.* § 78u–5(c)(1)(B). To adequately plead falsity, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading...." *Id.* § 78(u)–4(b)(1).

When a pleading is based on information and belief, a plaintiff must state with particularity all facts on which his belief is based. *Id.* § 78(u)–4(b)(1)(B). This means alleging the specific content of the documents upon which the plaintiff relied, identifying who prepared and who reviewed them, and setting out "sources of ... information with respect to the reports."

11. Congress enacted the PSLRA in 1995 to "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." *Silicon Graphics,* 183 F.3d at 973.

*Silicon Graphics,* 183 F.3d at 985. To meet these requirements, plaintiffs must couple each separate allegation in the FCAC with details identifying the sources upon which such beliefs are based. *Id.* This requirement is the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiffs to reveal whether they base their allegations on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts.

■ Scienter is not established by the mere publication of inaccurate accounting figures, or failure to follow generally accepted accounting procedures ("GAAP"),[12] without more. *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir. 1994), *cert. denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 and 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995). Rather, plaintiffs must show that the accounting practices were so deficient that no reasonable accountant would have made the same decisions if confronted with the same facts. *Id.*

### 3.

■ The Court will first address the accounting policy allegations, which fail to raise the required "strong inference of conscious recklessness." Plaintiffs' primary claim is that Vantive "secretly" changed its revenue recognition policies for its reseller arrangements sometime during its 1997 fiscal year. (FCAC ¶¶ 114–117.) Their conclusion is based on a comparison of Vantive's pre–1998 description of its revenue recognition policy on reseller contracts and its later description of the policy in Vantive's Form 10–K filed on March 25, 1998. (*Id.* ¶¶ 115–116.)

Prior to March 1998, Vantive described its revenue recognition policy as follows: "Sublicense fees are *generally* recognized as reported by the reseller in relicensing the Company's products to end users." (*Id.* at ¶ 115, emphasis altered.) In its Form 10–K filed on March 25, 1998, Vantive continued to describe its revenue recognition policy using language identical to that quoted above, although it added a description of how revenues were recognized when the general policy was not used:

> In certain circumstances, sublicense fees are recognized upon the initial sale if all products subject to sublicensing are shipped in the current period, no rights of return policy exits [*sic*] collection is probable, payment is due within one year, and fee is fixed or determinable.

(*Id.* at ¶ 116.)

Plaintiffs allege that the language in the 1998 disclosure represents a change, and that Vantive had been secretly realizing revenue under the "new" method prior to the disclosure.

The Court finds that the 1998 language does not necessarily represent a change in policy, nor have plaintiffs alleged any facts showing that the alleged change was "secret." The 1996 language does not represent that Vantive always recognized reseller revenues upon relicensing, only that it generally recognized revenue in that manner. The 1998 language merely provides greater detail about departures from the general policy. Having alleged no particularized facts to contradict this common-sense interpretation, plaintiffs claim that Vantive prematurely recognized its revenues must fail. Moreover, significantly, the FCAC does not allege that the revenues were recognized in violation of GAAP.

---

**12.** "GAAP consists of the official publications of the American Institute of Certified Public Accountants (AICPA). These official publications consist of Accounting Principles Board (APB) opinions, Financial Accounting Standards Board (FASB) Statements, and Accounting Research Bulletins (ARB). In the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP." *Providence Hosp. of Toppenish v. Shalala,* 52 F.3d 213, 219 n. 7 (9th Cir. 1995).

■ Plaintiffs do offer some specifics with regard to their claim that Vantive prematurely recognized a $19 million sale to EDS. (*Id.* ¶¶ 76(t)(u), 93(t).) The FCAC alleges that the EDS contract "contained a customary Statement of Work, which typically sets forth the customer's specifications in detail.... In the EDS contract, the Statement of Work only stated, 'To be determined.'" (*Id.* ¶ 93(t).) Without explaining this allegation, plaintiffs allege that Vantive had no basis to represent that the contract would be $19 million. This fails to allege with particularity how the allegedly incomplete statement of work affected Vantive's license revenues or how much of the projected $19 million was not ultimately recognized. Moreover, plaintiffs allege no facts connecting any individual at Vantive to the decision to recognize the EDS revenue in the manner described.

Plaintiffs' other allegations that Vantive improperly recognized revenue on sales to other distributors, including Lucent and HBOC, are similarly deficient, as demonstrated by this example:

> Many sales to distributors in the software industry are de facto contingent sales, notwithstanding what the agreements with vendors state. The distributors effectively are not obligated to pay for product until they resell the product because it is common practice to cancel and/or return product distributors are unable to sell.... Vantive's change in revenue recognition practice resulted in Vantive recording revenue up to two or three quarters prior to the time it would have recognized revenue under its prior method and the change also made the revenue Vantive recognized much more suspect. The fact that Vantive was accelerating revenue ... was not disclosed

(and was actually concealed) until many months later and then it was hidden in a footnote. In fact, Vantive was improperly accelerating its revenue recognition with respect to purported sales to certain resellers and distributors throughout 97 to cover up the deterioration of its business due to salesforce problems, product problems and the erosion of its competitive position detailed above.

(*Id.* ¶ 117 (emphasis deleted).) These allegations do not state a claim for fraud against defendants, as they do not allege who at Vantive told whom at Lucent, HBOC,[13] and perhaps other unidentified customers, that the payment was contingent, or how much revenue was involved in each sale. These blanket assertions, therefore, lack the requisite particularity and must, accordingly, fail.

4.

■ The Court will next examine the individual defendants' allegedly false and misleading statements. Except for the accounting fraud claims, this case arises from Vantive's July 6, 1998 press release announcing that its second quarter 1998 results would be "far below forecasted levels and that its results going forward would also be much lower than forecasted...." (*Id.* ¶ 113.) Plaintiffs allege that Vantive "admitted" that its disappointing results were due to "serious problems with Vantive's direct salesforce ... [and] that Vantive had been suffering from very high turnover in its direct salesforce...." (*Id.*) Plaintiffs then infer that throughout the class period, Vantive misrepresented the strength of its sales force and the competitiveness of its products through statements like the examples listed in Appendix A.[14]

---

**13.** In paragraph 118 of the FCAC, plaintiffs allege that it has since been revealed that HBOC was falsifying its own financial statement through recognition of revenue on phony contingent sales. This allegation is not tied to any transaction with Vantive or the amounts supposedly involved.

**14.** Many of these statements, and others in the FCAC, appear to the Court to merely be optimistic statements. The Court also notes that events occurring after the alleged class period do not show that the representations made during the class period were false when made, plaintiffs must point to particular con-

If the statements in the press releases and conference calls leading up to the alleged "revelation" of Vantive's true financial condition are not forward looking, then plaintiffs must allege facts giving rise to a strong inference of conscious recklessness. Because the allegations of the FCAC fail to meet even the conscious recklessness standard, the Court does not reach the analysis of whether defendants' statements were forward looking, and hence whether they would meet the "actual knowledge" standard.[15] The allegations in the FCAC are insufficient even to meet the conscious recklessness standard set forth in *Silicon Graphics*. 183 F.3d at 974. For example, central to plaintiffs' claim is the assertion that defendants failed to disclose that "Vantive merely hired unqualified sales people to increase the head count," but no particular facts are alleged to support this general conclusion. (FCAC ¶¶ 46(a)(i), 60(a)(i), 76(a)(i), 93(a)(i), 112(a).) No specifics are provided to substantiate the assertion that the sales people were unqualified or unproductive. Plaintiffs also do not offer any specific facts supporting their contention that at the time Vantive represented that its turnover rate was 10 percent, the turnover rate was actually 25 percent. Plaintiffs allege that the real figure was 25 percent without tying that figure to any particular period of time, and without referring to any documents or statistics that defendants allegedly knew about. (*See*, e.g., *id.* ¶ 93(a)(iii).)

Similarly, no specifics are alleged to support plaintiffs' allegations that Vantive was "unable to close large important sales" or that its "sales cycles were lengthening materially" or that Vantive was not "able to adequately train its new direct sales persons." (*Id.* ¶¶ 46(a)(ii), (c), (1); 60(a)(ii), (c), (m); 76(a)(I), (e), (p); 93(a)(ii), (c), (*o*),

112(a), (b), (f).) These allegations are general and conclusory.

▪ The allegations concerning defendants' knowledge of the circumstances complained of are similarly deficient. The FCAC alleges that each of the individual defendants knew Vantive's true condition because of their "hands-on" management style and their "interaction with other corporate officers and employees and their attendance at management and Board meetings." (*Id.* ¶ 25.) They also allegedly knew Vantive's true condition from reports generated on a weekly and monthly basis in the Finance Department (under Murphy). Without citing a single specific report or any specific dates, plaintiffs allege that "[t]here were 'license revenue reports,' 'service revenue reports,' 'contract revenue reports,' and reports that listed potential sales and the probability that the contract would be signed by the end of a given quarter, ... [and] financial reports comparing Vantive's *actual* financial results to *projected* results." (FCAC ¶ 24.) These boilerplate allegations fall far short of *Silicon Graphics'* standard because they do not specify the contents of the reports, who drafted them, when they were drafted, or who received them. *Silicon Graphics*, 183 F.3d at 984.

5.

▪ With respect to plaintiffs' allegations of insider trading, plaintiffs must allege particular facts giving rise to a strong inference of deliberate or conscious recklessness. *Id.* at 979. Here, the FCAC alleges that defendants were motivated to commit fraud in order to sell their shares at artificially inflated prices in order to profit from the fraud. (FCAC at ¶ 131.) In order to demonstrate that the insider trading was improperly motivated,

temporaneous facts that establish the falsity of the statement at the time it was made.

15. The Court notes, however, that the FCAC omits the safe harbor warnings that appear in each of the eight press releases paraphrased in the FCAC. Although defendants' statements

in those releases are in some instances combinations of current and historical fact and forward-looking statements, plaintiffs' artful omission of these obvious safe harbor warnings is cause for skepticism.

plaintiffs must allege that the stock sales were suspicious and " 'out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Silicon Graphics,* 183 F.3d at 1001 (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). In considering whether the stock sales are unusual or suspicious, the court may consider, among other things, (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether these sales were consistent with the insider's prior trading history. *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir.1996). The Court may consider SEC filings and the officers' exercisable (or vested) stock options in evaluating the percentage of stock sales, not just the shares actually owned. *Silicon Graphics,* 183 F.3d at 986–87. As a basis for comparison, it is instructive to review the insider trading allegations in this case with those in *Silicon Graphics.* The *Silicon Graphics* court drew no strong inference of conscious recklessness when insiders sold 2.6 percent, 7.7 percent, 4.1 percent, 6.9 percent, 43.6 percent, and 75.3 percent of their holdings, respectively, because it carefully examined the circumstances of the sales. For example, the Ninth Circuit concluded that the biggest sell-off was by a director who had been unable to trade his shares until the class period began. *Id.* at 987–88.

Here, the FCAC alleges the following insider trading by defendants:

| Name | # of trades | # & % of shares traded | Defendants' figure (if different) [16] |
| --- | --- | --- | --- |
| Jack | 3 | 129,000/ 55% | 33% |
| Jodoin | 4 | 120,000/ 48% | |
| Lochhead | 6 | 31,250/ 26% | 11% |
| Loo | 3 | 50,000/ 49% | 37% |
| Luongo | 2 | 200,000/ 13% | |
| Murphy | 4 | 60,865/ 32% | 23% |
| Sippl | 20 | 807,076/ 74% | |

16 The parties' computations differ somewhat. Where there is a discrepancy between the parties' figures, it is noted.

17. Of the ten paragraphs devoted to insider trading in the FCAC, three of them are merely

TOTAL shares sold: 1,398,191 (38% of total holdings). (FCAC ¶ 131.) [17]

No matter whose figures the Court uses, the trading activity in this case was undoubtedly substantial. The remaining question, then, is whether the timing and other circumstances of the trading is suspicious.

■ Vantive contends that the timing is not suspicious because some of the options only became exercisable in 1997 (e.g., 12,000 shares for Jodoin became exercisable in August 1997, 60,000 shares for Jack became exercisable in March 1997, and 60,000 shares became exercisable for Luongo in March 1997). (Resley Decl. Exs, E–2, E–4, E–7.) Further, virtually all the shares were sold *after* an earnings announcement. (Compare FCAC ¶¶ 37, 49, 65, 79, 94 (earnings announcements) with ¶ 131 (alleged sales).) Such timing tends to show that defendants actually sold after the earnings information had been disseminated to the public.

Finally, plaintiffs' allegation that "Jodoin and Lochhead sold no shares prior to the class period" (*id.* ¶ 131) is strained because Jodoin did not join Vantive until four months into the class period, and Lochhead joined Vantive less than a year before the class period began. (Resley Decl. Ex. D–5, Form 10–K, filed 3/31/97; FCAC ¶ 15(f).) Moreover, plaintiffs' representation that defendants sold 38 percent (in the aggregate) of their stock necessarily means that they retained 62 percent of it. Indeed, Luongo, the CEO of Vantive until April 1999, sold only 13 percent of his stock. Luongo personally negotiated the EDS licensing agreement, and is the most oft-quoted person in the FCAC. In his position as CEO, he was presumably in the best position to know the true facts, and yet his trading percentage belies any intent to rid himself of a substantial portion of his holdings. (*Id.* ¶ 15(a).) This minimal sale of stock tends to negate an infer-

information about repricing of stock options.

ence of scienter. Finally, Sippl, the one who sold the largest percentage of his shares, was an outside director.

Taken together, these deficiencies, combined with plaintiffs' insubstantial allegations that defendants knew the true facts through "internal reports," which fail to specify contemporaneous documents, emails, conversations, or memoranda contradicting defendants' challenged statements, render the complaint defective as a whole. "General allegations regarding negative internal reports and stock sales do not give rise to a strong inference of deliberate recklessness." *Silicon Graphics,* 183 F.3d at 988.

### B.

Plaintiffs' claim under § 20(a) of the Exchange Act fails because it requires a primary violation and, as set forth above, the FCAC fails to state such a claim. Absent an adequate pleading of a Rule 10b–5 claim against Vantive, plaintiffs' "control person" claims against the individual defendants must be dismissed. *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971 (9th Cir.1999).

### III.

Having had three opportunities to plead their best possible case, plaintiffs' allegations, taken together, fail to raise a strong inference of deliberate recklessness on the part of defendants. Under the circumstances, it would be futile to grant plaintiffs leave to amend. Defendants' motion to dismiss the FCAC is granted.

Accordingly,

IT IS HEREBY ORDERED that:

1. Defendants' motion to strike the FCAC is DENIED.

2. Plaintiffs' motion for leave to amend its allegations *nunc pro tunc* is GRANTED.

3. Defendants' request for judicial review is GRANTED except as to the conference call transcripts.

4. Plaintiffs' motion to strike excerpts of conference call transcripts submitted by defendants is GRANTED.

5. Defendants' motion to dismiss the consolidated amended complaint ("FCAC") is GRANTED, and this action is dismissed with prejudice.

### APPENDIX A

This Appendix contains examples from the FCAC of allegedly false and misleading statements made in conference calls and in "follow-up" conversations with analysts.

1. "The growth and performance of Vantive's direct sales force remained on plan, as Vantive was succeeding in hiring large numbers of qualified sales persons and training them, thus making them productive quickly. 60% of the sales force would be productive by 3rdQ97 when Vantive 7 was released. Salesforce turnover remained low." (FCAC at 37–38.)

2. "Vantive's new partnerships with EDS and Learning International (new resellers) were successful, contributing significant revenues." (*Id.* at 38.)

3. "Vantive had signed a $19 million deal with EDS—which would generate revenue for Vantive *through year end 98* and likely millions in follow-on revenue after that." (*Id.*)

4. "During the 2ndQ97, Vantive had experienced good demand for all its product lines in the U.S." (*Id.*)

5. "Due to strong demand for its products and its HBO, Learning International and EDS distribution agreements, Vantive had achieved sharply increased license sales in the 2ndQ97, via its indirect channels, indicating its effort to expand its indirect channel sales were successful." (*Id.*)

6. "Due to strong demand and successful execution, Vantive's sales cycle was holding steady at 3–6 months." (*Id.*)

7. "Vantive had competitive advantages in the front-office software industry due to

its high-quality products which were technologically superior and provided superior functionality." (*Id.*)

8. "Vantive's salesforce automation products—Vantive Sales and Vantive On-the-Go—were ramping faster than expected, succeeding and contributing to better-than-expected revenue growth." (*Id.*)

9. "Vantive's extremely strong executive and sales management was a key competitive advantage as it gave Vantive the ability to successfully manage its extremely rapid growth." (*Id.*)

10. "Vantive was successfully developing Vantive Sales (Version 7) which would be released in the 3rdQ97 and increase revenues and EPS in 98 and 99." (*Id.*)

11. "Vantive was forecasting 98 revenues of $180+ million, 98 EPS of $.77–.$83 and was forecasting strong ongoing EPS growth of 45%–50% for the next three to five years." (*Id.*)

(*See* FCAC at 49, 63 and 75 for a complete listing of all the allegedly false statements.)