### In re HARMONIC, INC. SECURITIES LITIGATION,

**This Document Relates To: All Actions**

**No. C–00–2287 PJH.**

United States District Court,
N.D. California.

July 5, 2001.

---

## ORDER GRANTING MOTIONS TO DISMISS

HAMILTON, District Judge.

Defendants' motions to dismiss the consolidated amended complaint came on for hearing on May 30, 2001, before this court, the Honorable Phyllis J. Hamilton presiding. Plaintiffs appeared by their counsel Reed R. Kathrein, Shawn A. Williams, Edward M. Gersosian, and David Kessler; the Harmonic, Inc., defendants appeared by their counsel Melvin R. Goldman and Terri Garland; and the C–Cube Microsystems, Inc., defendants appeared by their counsel Terry T. Johnson and Hanley Chew. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motions to dismiss for the following reasons.

## INTRODUCTION

This is a proposed class action alleging violation of the federal securities laws. Defendant Harmonic, Inc., ("Harmonic") merged with the DiviCom division of C–Cube Microsystems, Inc. ("C–Cube") on May 3, 2000. The merger was approved by the shareholders of both corporations at shareholders' meetings conducted in late April 2000 As part of the merger, the shareholders of C–Cube's successor corporate entity received shares of Harmonic common stock, issued pursuant to a March 23, 2000, Registration Statement and Joint Proxy Statement/Prospectus filed with the SEC on March 24, 2000.

On June 26, 2000, Harmonic announced that its results for the second quarter of 2000 would be lower than anticipated. The price of Harmonic's stock dropped significantly on June 27, 2000, and plaintiffs filed suit, alleging that Harmonic and C–Cube had concealed or failed to disclose material information about, or had made false statements about, the companies' financial prospects.

The proposed class consists of all persons or entities who purchased or acquired Harmonic securities during the class period (January 19, 2000, to June 26, 2000), or who purchased or acquired C–Cube securities during the subclass period (January 19, 2000, to May 3, 2000). The subclass consists of all persons who acquired Harmonic shares pursuant to the registration statement and prospectus for the May 2000 merger between Harmonic and C–Cube.

## BACKGROUND

Harmonic was founded in 1988 and went public in 1995. Harmonic provides fiber optic systems for cable operators, and has also developed and marketed digital video equipment. Historically, a significant portion of Harmonic's sales have been to a relatively small group of customers, AT & T being one of the largest.

C–Cube Microsystems, Inc., which manufactured and sold semiconductors and systems for digital video applications, was also founded in 1988. Until May 2, 2000, C–Cube had two divisions—the semiconductor division, which manufactured and sold communication processors used in digital video disc (DVD) players and other products, and the DiviCom division,[1] which

---

1. C–Cube acquired DiviCom in 1996.

manufactured and sold products relating to the transmission of digital video, audio, and data over satellite, wireless, and cable networks.

On October 27, 1999, Harmonic and C–Cube entered into an agreement to merge C–Cube's DiviCom division with Harmonic. On December 9, 1999, the parties amended and restated the merger agreement. The amended agreement required all holders of vested options in C–Cube stock to exercise those options before the close of the merger, and also provided that C–Cube would spin off or sell its semiconductor business before the merger.

On January 19, 2000, Harmonic announced its results for the quarter and year ending December 31, 1999. Sales were up 134% from the fourth quarter of 1998, and net income for 4Q99 was $.33 a share, compared with net income of $.02 in 4Q98. (In the same announcement, Harmonic also disclosed that sales to AT & T, one of its major customers, had declined as a percentage of Harmonic's total sales during 4Q99, from the percentage reported for 3Q99.) Anthony Ley, President and CEO, was quoted as saying, "We are very pleased with our growth in sales and profitability, and our continued development and roll-out of new systems." The results announced by Harmonic exceeded the earnings per share estimates, and various securities analysts subsequently issued "strong buy" recommendations.

The price of Harmonic's and C–Cube's stock, which had been rising throughout the fall of 1999, continued to rise during the period after January 19, 2000, hitting highs of slightly over $152 (Harmonic) and $102 (C–Cube) on March 6, 2000. Despite continued "strong buy" recommendations

from the analysts, however, the price of shares in the two companies began to fall after reaching the March 6th high, following the general trend of the NASDAQ, which reached its historic high at approximately the same time, and subsequently declined.

On March 23, 2000, Harmonic filed a Form S–4 Registration Statement ("the Form S–4") with the SEC, which incorporated a Joint Proxy Statement/Prospectus issued by Harmonic and C–Cube and dated March 24, 2000. The joint proxy and prospectus discussed the merger between Harmonic and C–Cube, and stated that it was the unanimous recommendation of the boards of directors of both Harmonic and C–Cube that the shareholders of both corporations vote in favor of the merger at the shareholders' meeting, which was scheduled for April 24, 2000.

On March 30, 2000, Harmonic filed its Form 10K for 1999 with the SEC. On April 19, 2000, in a press release, Harmonic announced its results for the first quarter of 2000, again reporting a decline in percentage of sales to AT & T (from 4Q99 to 1Q00). On April 24, 2000, the shareholders of Harmonic and C–Cube voted to approve the proposed merger.

On May 2, 2000, the assets of C–Cube's semiconductor division were transferred to a newly formed corporation, C–Cube Semiconductor. On May 3, 2000, what remained of old C–Cube [2] (the DiviCom division) was merged into Harmonic.[3] Harmonic issued common stock pursuant to the registration statement on May 3, 2000, and new C–Cube stockholders received .5427 of a share of Harmonic common stock in exchange for each share of C–Cube common

---

**2.** In its motion to dismiss, C–Cube refers to the pre-May 2nd C–Cube and the post-May 2nd C–Cube as "old C–Cube" and "new C–Cube," respectively.

**3.** When the merger became effective, old C–Cube ceased to exist—its common stock was de-listed from the NASDAQ, and the corporation was de-listed under the Securities Exchange Act.

stock. After the merger, C–Cube Semiconductor (new C–Cube) changed its name to C–Cube Microsystems, Inc. (which was also old C–Cube's name before the merger).

On May 15, 2000, Harmonic filed its Form 10–Q for the first quarter of 2000 with the SEC, reporting the fact (previously disclosed in the April 19th press release) that the AT & T portion of total sales had declined since 4Q99. Harmonic's Form 10–Q also disclosed DiviCom's results for the first quarter (even though DiviCom did not become part of Harmonic until the second quarter). C–Cube filed a Form 10–Q for 1Q00 on May 15.

On May 16, 2000, the price of Harmonic's stock, which had been generally falling since reaching its high of 152⅜ on March 6, 2000, dropped from 65¾ on May 16, to 38 on May 26. It recovered somewhat after May 26th but, on June 26, 2000, before the second quarter had ended, Harmonic announced that results for that quarter would be lower than anticipated. The next day, June 27, 2000, the price of Harmonic's stock fell to 22¹¹⁄₁₆. The first complaints were filed in district court on June 28th.

Defendants are Harmonic, C–Cube, and the following executive officers and directors of the two corporations: Anthony Ley—President, CEO, and Chairman of the Board of Harmonic; Robin N. Dickson—CFO of Harmonic; Michael Yost—Vice President, Operations, Harmonic; Kirk Flatow—an Officer of Harmonic; Moshe Nazarathy, Floyd Kvamme, David Lane, Barry Lemieux, and Michel Vaillaud—Directors of Harmonic; Alexandre Balkanski—President and CEO of old C–Cube to 5/3/00, then a Director of new C–Cube; Tom Lookabaugh—President of DiviCom Division of old C–Cube until May 3, 2000, then an Officer of Harmonic; Fred Brown—Vice President, Worldwide Sales, C–Cube (old and new); Richard Foreman—Chief Information Officer, and Vice

President, Information Technology, C–Cube (old and new); Donald McKinney—Senior Vice President, Worldwide Sales, and a Director of C–Cube (old and new); Umesh Padval—President of Semi–Conductor Division of old C–Cube to May 3, 2000, then President, CEO, and a Director of new C–Cube; Donald Valentine—Chairman of the Board and a Director of C–Cube (old and new); Walt Walczykowski—Vice President, Finance, and CFO of C–Cube (old and new); Baryn Futa—a Director of old C–Cube until May 3, 2000, then a Director of Harmonic; and Gregorio Reyes—a Director of C–Cube (old and new).

Plaintiffs allege 4 causes of action in the "[Corrected] Consolidated Amended Complaint" (referred to herein as the "complaint"). The basis of the complaint is that Harmonic and C–Cube publicly reported financial results, discussed their plans to merge DiviCom with Harmonic, and made optimistic statements about their expectations for Harmonic's future prospects, and that these statements and comments—contained in the Form S–4 (registration statement, prospectus, and proxy solicitation), and in various SEC filings, press releases, and discussions with analysts—were false and misleading because they failed to disclose that AT & T was reducing its orders for Harmonic's products and that DiviCom was suffering from declining sales to its satellite customers.

The first two causes of action are alleged by plaintiffs Knollenberg and Glynn, on behalf of themselves and the subclass of plaintiffs who acquired Harmonic shares pursuant to the registration statement and prospectus, respectively. The first cause of action alleges that the Harmonic defendants made false statements and material omissions in the registration statement, in violation of § 11(a)(1) and (2) of the 1933 Securities Act, 15 U.S.C. § 77k(a)(1) and

(2); while the second alleges false statements and material omissions in the prospectus, in violation of § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2). Both the first and the second causes of action also allege controlling person liability in violation of § 15 of the 1933 Act, 15 U.S.C. § 77o.

The third cause of action is alleged by plaintiffs Knollenberg and Glynn, on behalf of themselves and all subclass members who held Harmonic or C–Cube common stock on April 24, 2000 (the date the shareholders voted to approve the merger) and still held those shares on May 3, 2000 (the date the merger became final). The third cause of action alleges false and misleading statements and material omissions in the solicitation of proxies, in violation of § 14(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9.

The fourth cause of action, alleging a violation of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, is alleged by all plaintiffs on behalf of themselves and the entire class, who purchased shares of Harmonic between January 19, 2000, and June 26, 2000, and alleges false statements and material omissions throughout the class period. The fourth cause of action also alleges controlling person liability, in violation of § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

## DISCUSSION

### A. Legal Standards

1. Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6)

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *See*

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924, 928 (9th Cir.1994). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996).

Review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). When matters outside the pleading are presented to and not excluded by the court, a Rule 12(b)(6) motion is to be treated as one for summary judgment, and all parties shall be given opportunity to present all material made pertinent to such a motion by Rule 56. *See* Fed. R.Civ.P. 12(b). However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989). If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994).

2. Federal Rule of Civil Procedure 9(b)

Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice. Fed.R.Civ.P. 8. In actions alleging fraud, however, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the

identity of the person engaged in the fraud. *See In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547–49 (9th Cir.1994).

### 3. Claims under the 1933 Act

Under § 11(a) of the 1933 Securities Act, any purchaser of a security covered by a registration statement may sue based on material omissions or misrepresentations in that statement. 15 U.S.C. § 77k(a). Persons liable under § 11(a) are those who signed the registration statement, directors of or partners in the issuer, professionals who participated in the preparation of the registration statement, and underwriters of the security. *Id.* In order to plead a § 11(a) claim, a plaintiff must allege that the registration statement contained an omission or misrepresentation, and that the omission or misrepresentation was material—that is, that it would have misled a reasonable investor about the nature of his or her investment. *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir.1996), *cert. denied*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997).

Section 12(a)(2) of the 1933 Act makes it unlawful for any person to use any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). To establish liability under § 12(a)(2), plaintiffs must allege that the defendants actively solicited purchase of the securities for "their own financial motives." *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1120 (D.Nev.1998) (citing *Pinter v. Dahl*, 486 U.S. 622, 646–48, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

Section 15(a) imposes joint and several liability upon every person who controls any person liable under §§ 11 or 12. 15 U.S.C. § 77o. Thus, violation of § 15 is predicated upon violation of § 11 or § 12. To state a claim for control person liability under § 15, a plaintiff must allege that the individual defendants had the power to control or influence the company, and that the individual defendants were culpable participants in the company's alleged illegal activity. *Durham v. Kelly*, 810 F.2d 1500, 1503 (9th Cir.1987).

### 4. Claims under the 1934 Act

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b–5 makes it unlawful for any person to use interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In order to state a claim under § 10(b) and Rule 10b–5, the plaintiff must allege 1) a misrepresentation or omission 2) of material fact 3) made with scienter 4) on which the plaintiff justifiably relied 5) that proximately caused the alleged loss.

*Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.1999), *cert. denied*, 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000). A presumption of reliance is available to plaintiffs alleging violations of § 10(b) based primarily on omissions of material fact, but not in cases alleging significant misrepresentations in addition to omissions, or alleging only misrepresentations. *Id.* at 1063–64.[4]

Section 14(a) of the 1934 Act regulates the solicitation of proxies with respect to any security registered under the Act. "It shall be unlawful for any person ... in contravention of [SEC rules and regulations] ... to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security" registered pursuant to the Act. 15 U.S.C. § 78n(a). SEC Rule 14a–9, which was promulgated under § 14, provides that

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, ... containing any statement, which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...

17 C.F.R. § 240.14a–9.

Under § 20(a) of the 1934 Act (which is "an analog of section 15 of the [1933 Act]," *Durham*, 810 F.2d at 1503), joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *See Durham*, 810 F.2d at 1503–04.

### 5. The Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act ("PSLRA") was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.'" *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 978 (9th Cir.1999). The PSLRA added heightened pleading requirements for alleging both falsity and scienter in securities fraud actions under the 1934 Act. If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. *See* 15 U.S.C. § 78u–4(b)(3)(A).

Under the PSLRA—whether alleging that a defendant "made an untrue statement of a material fact" *or* alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"—the complaint must 1) "specify each statement alleged to have been false or misleading," 2) specify "the reason or reasons why the statement is misleading," and, if an allegation regarding the statement or omission is made on information and belief, 3) "state with particularity all facts on

---

4. A presumption of reliance is also available in a "fraud on the market" case, where the plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an "efficient market." *Id.* at 1064 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

which that belief is formed." 15 U.S.C. § 78u–4(b)(1).[5]

In addition, with regard to pleading scienter—whether alleging that a defendant "made an untrue statement of material fact" *or* alleging that a defendant "omitted to state a material fact"—the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In the Ninth Circuit, the requirement that the facts must give rise to a "strong inference ... [of] the required state of mind" means, for claims under § 10(b), that "the evidence must create a strong inference of, at a minimum, 'deliberate recklessness.'" *In re Silicon Graphics*, 183 F.3d at 977. Because § 14 is part of the 1934 Act, the particularity requirements of the PSLRA also apply. The required state of mind for a § 14 claim is negligence, however, not knowledge or deliberate recklessness. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000).

The "deliberate recklessness" standard for § 10(b) claims applies to allegations that company officials made false or misleading statements that were not forward-looking. The PSLRA created a "safe harbor" in both the 1933 and 1934 Acts for forward-looking statements that are either immaterial, limited by "meaningful cautionary statements," or made without actual knowledge that the statement was false

or misleading. 15 U.S.C. § 77z–2(c) (1933 Act); § 78u–5(c) (1934 Act). Forward-looking statements can be written or oral, and include projections of revenues, statements of plans and objectives of management for future operations, and statements of future economic performance, as well as statements of assumptions underlying or relating to a plan, projection, or statement of future economic performance. 15 U.S.C. § 77z–2(i)(1); § 78u–5(i)(1).[6] Because protected forward-looking statements cannot provide a basis for liability, a complaint alleging fraud based on forward-looking statements must allege facts suggesting materiality, lack of meaningful cautionary language, and the actual knowledge of the speaker that the statement was false and misleading. *Id.; see also In re Vantive Corp. Sec. Litig.*, 110 F.Supp.2d 1209, 1215 (N.D.Cal.2000).

## B. Defendants' Motions to Dismiss

1. Motions to Dismiss of "New" Harmonic Defendants[7] and C–Cube Officers and Directors

Defendants seek to dismiss all four causes of action on the basis that plaintiffs have failed to allege falsity with particularity, as required by Federal Rule of Civil Procedure 9(b). Defendants also move to dismiss the §§ 14(a) and 10(b) claims on the ground that the allegations do not meet the requirements of the PSLRA.

**5.** Matters that are not alleged on personal knowledge are considered to be alleged on information and belief. *In re Splash Technology Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, *12 (N.D.Cal. Sept. 29, 2000).

**6.** Statements concerning historical or present facts are not forward-looking. *In re Splash*, 2000 WL 1727377*5.

**7.** At the time of the merger, one of old C–Cube's officers (Tom Lookabaugh) and one of

old C–Cube's directors (Baryn Futa) became, respectively, an officer and a director of Harmonic. Thus, while Lookabaugh and Futa are identified in the complaint as C–Cube defendants, the parties now refer to them as Harmonic defendants, and the entire group of Harmonic defendants, including Lookabaugh and Futa, are referred to as the "new Harmonic defendants,"—presumably to distinguish them from the group listed in the complaint.

### a. The § 11(a), § 12(a), § 15, § 14(a), and Rule 14a–9 claims

Plaintiffs do not single out any particular statement in the Form S–4 as false. The basis of the claims with regard to the Form S–4 appears to be that the registration statement, the prospectus, and the joint proxy did not disclose a complete picture of Harmonic's and DiviCom's financial condition and economic prospects as of the date the Form S–4 was filed.

In the first cause of action, plaintiffs allege § 11(a) claims against Harmonic, Ley, Dickson, Nazerathy, Kvamme, Lane, Lemieux, and Vaillaud, and in the second cause of action, allege §§ 12(a) and 15 claims against Harmonic and Ley. In the §§ 11 and 12 claims, plaintiffs allege that the registration statement and prospectus were false and misleading because they omitted to state that sales to AT & T were down. Plaintiffs assert that the allegations giving rise to the §§ 11 and 12 claims do not involve any allegations of fraud by defendants.

In the third cause of action, plaintiffs allege § 14(a) claims against Harmonic, Ley, Nazerathy, Kvamme, Lane, Lemieux, Vaillaud, C–Cube, Balkanski, McKinney, Padval, Valentine, Futa, and Reyes, and Rule 14a–9 claims against Harmonic, C–Cube, Ley, and Balkanski. In the § 14(a) and Rule 14a–9 claims, plaintiffs claim that the joint proxy solicitation was misleading because failed to disclose that sales to AT & T were down and that DiviCom's business was "flat."

■ The court finds that the §§ 11(a) and 12(a) claims plainly sound in fraud, plaintiffs' assertions notwithstanding. Plaintiffs allege that during the period leading up to the merger, defendants knew that sales to AT & T had slowed and that DiviCom's business was flat, but did not disclose that information publicly; that defendants publicly represented that strong business trends were continuing and that the acquisition of DiviCom would be highly beneficial to Harmonic; that the price of Harmonic's stock "surged" based on that information; and that the increase in stock value enabled Harmonic and C–Cube to obtain shareholder approval for the merger and enabled Harmonic and C–Cube defendants to "dump" more than $1 million worth of stock. The public representations included the registration statement, prospectus, joint proxy solicitation, and SEC reports incorporated by reference in the registration statement.

In the "Introduction and Overview" section of the complaint, plaintiffs allege that on June 26, 2000, Harmonic "exposed problems [it] had been experiencing during the Class Period." Cplt ¶ 5. In the § 12 claim, plaintiffs allege that "defendants knew, or in the exercise of reasonable care should have known, of the material untrue statements in and omissions from the Prospectus." Cplt. ¶ 47. In the § 14 claim, plaintiffs allege that "defendants knew that the Joint Proxy contained misstatements of material fact and that it omitted to state material facts necessary in order to make the statements therein not misleading." Cplt ¶ 59. The essence of these claims is that defendants deliberately—not negligently or accidentally—withheld unfavorable information concerning AT & T and DiviCom from the Form S–4. Plaintiffs cannot evade the requirements of Rule 9(b) simply by reciting that there are no allegations of fraud in the §§ 11 and 12 claims.

Although no scienter or reliance is required for liability under §§ 11 or 12 because the PSLRA does not apply to claims under the 1933 Act, *In re Stac,* 89 F.3d at 1404, and defendants may be liable even for innocent or negligent misstatements or omissions, *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the particularity

requirements of Federal Rule of Civil Procedure 9(b) apply to such claims if the allegations sound in fraud, even if the complaint states otherwise. *In re Stac*, 89 F.3d at 1404–05.[8] Adoption of the Rule 9(b) pleading standard is appropriate "where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims." *Id.* at 1405 n. 2.

■ The court finds that plaintiffs have not pled falsity with particularity, as required by Fed.R.Civ.P. 9(b). In the § 11 claim, plaintiffs allege, "Despite attributing much of Harmonic's past success to AT & T, and despite warning that a reduction of orders from AT & T would harm Harmonic's business, the Registration Statement omitted to state that AT & T had drastically reduced its orders to Harmonic." Cplt ¶ 36. Plaintiffs do not dispute the numbers (regarding Harmonic's past sales and earnings) stated in the registration statement and the SEC filings incorporated by reference, and they correctly note that the registration statement clearly indicated that sales and earnings in the future might be lower than in the past.[9] Plaintiffs simply assert that all the information provided in the registration statement was misleading because defendants omitted to state that, as of the date of filing of the registration statement, sales to AT & T were down from previous levels.

Nevertheless, plaintiffs' § 11 allegations are inadequate because they do not provide any specifics supporting the allegations that AT & T "changed its strategy"

in mid–1999, and "decided to emphasize increasing its subscriber base rather than improving and expanding its network;" that AT & T "needed far fewer products from Harmonic," that it "canceled several purchases," that it rescheduled delivery of other orders "as far into the future as possible," was "forced to accept millions of dollars in custom components that it had ordered and no longer wanted." Cplt ¶¶ 30, 31.[10]

In the § 12 claim, plaintiffs rely on the allegations in the § 11 claim, adding that, "[b]y use of the Registration Statement which contained the materially misleading statements and omitted material facts, Harmonic sold its common stock to the Subclass in exchange for their C–Cube stock.... But for these defendants having drafted, filed and/or signed the Registration Statement, the merger between Harmonic and C–Cube would not have closed and plaintiffs would not have acquired Harmonic shares." Cplt ¶ 46. Nowhere in the second cause of action do plaintiffs provide any information about the "materially misleading statements and omitted material facts," other than the incorporation by reference of ¶¶ 1–42 of the complaint. Similarly, the § 14(a) and Rule 14a–9 claim refers to "[t]he materially misleading statements and omissions ... set forth in the First and Second Claims for relief," Cplt ¶ 57, and alleges only that defendants "knew that the Joint Proxy contained misstatements of material fact and that it omitted to state material facts

8. Although the Ninth Circuit in *In re Stac* applied this rule to § 11 claims only, as no § 12 claim was alleged in that case, the court noted with approval other cases that did apply Rule 9(b) to other claims under the 1933 Act. *Id.*

9. For example, the section of the registration statement that discussed risk factors relating to the merger, includes the statement, "Both

Harmonic's and the DiviCom business' customer bases have historically been highly concentrated. The loss of AT & T or any other key customer would have a negative effect on the combined company's business after the merger."

10. Citations to the "[Corrected] Consolidated Amended Complaint" are indicated as "Cplt ¶ ___."

necessary in order to make the statements therein not misleading." Cplt ¶ 59.

Because plaintiffs fail to plead falsity with particularity, the motion to dismiss the § 11(a), § 12(a), § 14(a) and Rule 14a–9 claims is GRANTED, with leave to amend.[11] The motion to dismiss the § 15 claim is GRANTED on the basis that plaintiffs have not stated a claim with regard to § 11 or § 12.

b. The § 10(b), Rule 10b–5, and § 20 claims

■ In the fourth cause of action, plaintiffs allege § 10(b) and Rule 10b–5 claims against Harmonic, Ley, Nazerathy, Kvamme, Lane, Lemieux, Vaillaud, C–Cube, Balkanski, McKinney, Padval, Valentine, Futa, and Reyes. Plaintiffs allege the § 20 claim against Harmonic, C–Cube, Ley, and Balkanski. Defendants move to dismiss on the ground that plaintiffs fail to plead falsity with particularity, to identify the basis of their information and belief pleading, or to plead that defendants acted with the required state of mind, as required by the PSLRA.

Not the least of the reasons that this rambling, long-winded, redundant, unwieldy complaint is so confusing and unintelligible is plaintiffs' presentation of the fourth cause of action. Plaintiffs allege both the making of false statements and the omission of necessary material information. Yet in flagrant disregard of the plain language of the PSLRA and of the guidance provided by dozens of decisions issued by the Ninth Circuit and the district courts of this circuit, they fail, on the most basic level, to communicate what the false or misleading statements were, who made them, and why they were false or misleading.

The fourth cause of action includes a 25–page section entitled "False and Misleading Statements." Nevertheless, the court was unable to ascertain which (if any) of the many statements in that section are actually alleged to be false. Alleging falsity under the PSLRA involves a two-step process. The plaintiffs must first specify each misleading statement, and then specify the reason or reasons each of those statements was false or misleading at the time it was made. In other words, when alleging that specific statements were misleading, the complaint must make "specific references to specific facts," and must allege that the "true facts" arose prior to the allegedly misleading statements. *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1251 (N.D.Cal.1998). The most direct way of explaining why a statement was false or misleading when made is to identify inconsistent contemporaneous statements or information, created by, or made available to, the defendants. *GlenFed*, 42 F.3d at 1549. A complaint may not demonstrate that a statement was false or misleading when made, however, "merely by pointing to later inconsistent statements or conditions." *Id.*

In this case, plaintiffs' method is to provide a selection of quotations from various press releases, meetings and conference calls with analysts, and analysts' reports, organized chronologically, and all stating generally positive things about Harmonic's past performance and economic prospects. Interspersed between the long quoted passages are allegations that the defendants "knew" that sales to AT & T were dropping and that sales of DiviCom's products were slowing as well. But nowhere do plaintiffs identify specific statements that were false, provide specific reasons why

---

11. The court also finds that the allegations in the § 14 claim that are pled on information and belief are not pled with particularity. Nor have plaintiffs stated with particularity

facts giving rise to a strong inference that defendants acted with the required state of mind, which in a § 14 case is negligence.

such statements were false, or even attribute a specific statement to a specific defendant (with the exception of a report of a single interview with Dickson). Nor do they identify any specific passage as being misleading because it omitted a necessary material fact, provide any reason why any particular passage was misleading, or specify the statements or information required to make the statement not misleading.

For example, at the beginning of the "False and Misleading Statements" section, plaintiffs quote a lengthy press release issued jointly by Harmonic and C–Cube on January 19, 2000. Cplt ¶ 89. Within that passage, certain phrases or sentences are highlighted, as follows:

[During the fourth quarter of 1999, AT & T] **continued to be [Harmonic's] largest single customer**[.]

During the [fourth quarter of 1999,] **Harmonic announced a definitive agreement to acquire the DiviCom business of C–Cube Microsystems (Nasdaq: CUBE).**

[Anthony Ley stated that] **We are very pleased with our growth in sales and profitability, and our continued development and roll out** of exciting new systems.

**In 2000, we intend to continue** [to develop advanced fiber optic and digital systems] . . . **and complete the acquisition and integration of DiviCom.** [The combination with DiviCom] **will double the size of our company and allow us to offer more complete solutions for cable operators, as well as expand our penetration into telecommunications, satellite, wireless, and other emerging broadband markets. We expect that combining DiviCom's strengths in digital compression and our strengths in fiber optics will significantly enhance Harmonic's position in the broadband market.**

Although plaintiffs do not specifically state that the highlighted portions of the January 19, 2000, press release are meant to be false or misleading, that is the message communicated by plaintiffs' placement of the quoted material in a section headed "False and Misleading Statements." Thus, in reviewing the complaint, the court assumed, for example, that the statement that AT & T was Harmonic's largest single customer during the fourth quarter of 1999 was alleged to be a false statement. However, nothing in the general vicinity of ¶ 89 explains why that statement is false or misleading. Apart from the allegations 15 pages earlier, in the first cause of action at ¶¶ 30–31, the first even remotely relevant explanation appears 13 pages after ¶ 89, in ¶ 115, where plaintiffs allege that defendants "knew from their communications with AT & T that AT & T had excessive inventories of Harmonic's products caused by AT & T's aggressive purchases in 1999," and that "[a]s AT & T worked down this inventory, Harmonic would suffer a significant decline in demand from AT & T." However, plaintiffs do not state which defendants "knew" this, do not identify the "communications with AT & T" with any particularity, do not identify the "products," do not explain how or why AT & T's purchases were "aggressive," and provide no information regarding the "excessive inventories."

Twelve pages later, in ¶ 144 (under the section headed "Scienter"), plaintiffs allege that in the fourth quarter of 1999, Harmonic benefitted from large shipments of custom built components to AT & T, which allowed the reporting of favorable results for the quarter. In the same paragraph, plaintiffs add that Harmonic failed to relate to the market that AT & T had been canceling and pushing out orders for the entire year and that the fourth quarter sales "were due primarily to AT & T's

obligation to remit payment and accept delivery of 'huge quantities' of custom built product that it could not cancel." In ¶ 145, plaintiffs reiterate that the sales reported for the fourth quarter "were related to AT & T's acceptance of product due to a contractual obligation and not due to increased demand." Not only are these allegations totally devoid of the particularity required by the PSLRA, none of them explains why the statement that "AT & T continues to be Harmonic's largest single customer" was false or misleading on January 19, 2000.

The second highlighted passage in the January 19, 2000, press release states that during the fourth quarter of 1999, "Harmonic announced a definitive agreement to acquire the DiviCom business of C–Cube." Plaintiffs do not indicate that this statement is false or misleading; since the basis of the complaint concerns the acquisition of C–Cube's DiviCom division by Harmonic, it would seem to be a true statement. Nor is there the slightest suggestion that the statement was misleading because it omitted to state some essential material fact.

In ¶ 97, plaintiffs quote from a February 24, 2000 C–Cube press release, highlighting the following passages:

> [DiviCom announced that] **it had been selected to deploy its digital head-end solution** for SATEL TV, a new Panama-based uplink facility . . .
> [Hector Chong, SATEL's general manager, stated that] **"DiviCom distinguished itself** from other head-end suppliers with its superb video and audio quality . . ."
> **The SATEL TV deployment follows three recent DiviCom wins in the region**—[in Columbia, Puerto Rico, and Curacao.]

Again, there is no indication why these statements are false, or even if they are false. Are plaintiffs claiming that Divi-

Com was not selected by SATEL TV? That DiviCom did not distinguish itself, or that Mr. Chong did not in fact state that DiviCom had distinguished itself? That DiviCom did not sell systems to other TV networks in the region or did not sell systems in Columbia, Puerto Rico, or Curacao?

Two paragraphs later, in ¶ 99, plaintiffs refer to the registration statement, prospectus, and joint proxy as omitting "any information about Harmonic's problems with AT & T and DiviCom's poor sales, as set forth in ¶ 115 below." Turning, then, to ¶ 115, the court finds the allegation that "DiviCom sales had significantly stagnated," that "DiviCom's satellite customers, which comprised 80% of its sales, were increasingly voicing their concern about DiviCom's commitment to the satellite business now that it was merging with a cable company," and that DiviCom's satellite customers (unidentified), in response to the merger announcement, "immediately withdrew their purchase orders from DiviCom and placed orders with DiviCom's direct competitors" (unidentified). Plaintiffs do not provide any specifics about DiviCom's sales, much less explain what they mean by asserting that DiviCom's sales had "significantly stagnated." Nor do they identify the "satellite customers," identify the person or persons to whom such customers were "voicing their concerns," or specify which purchase orders were withdrawn or the amount of the allegedly canceled orders—much less explain why the statements in the February 24, 2000, press release were false or misleading.

Digging further, the court finds in ¶ 148 the allegation that "immediately upon learning of the merger agreement," DiviCom's largest satellite customers (DirecTV, LookTV, and EchoStar) "openly expressed serious concern that DiviCom's

acquisition by a cable company would draw the company's focus and development efforts away from the satellite products in favor of its cable products," and that these same customers canceled orders during the first quarter of 2000 and placed them with DiviCom's competitors. Presumably, the allegations in ¶ 148 are meant to expand on the allegations in ¶ 115, although that much is not clear from the complaint. Nevertheless, these allegations, while referring generally to the subject of the growth or non-growth of DiviCom's sales, do not satisfy the requirements of the PSLRA and do not explain why the highlighted passages in the February 24, 2000, press release (quoted above) are false or misleading.

At oral argument, when the court asked plaintiffs' counsel whether the various highlighted passages in the "False and Misleading Statements" section of the complaint were meant to be false, using as an example the statement (in the January 19, 2000, press release) that during the fourth quarter of 1999, "AT & T continued to be Harmonic's largest customer."

Counsel replied, "We never say that 'AT & T was [Harmonic's] largest customer' is meant to be false," adding "Principally here we're talking about omissions." He asserted that the quoted passages give a "false impression," although they are "maybe not false statements," and explained that certain passages in the material quoted in the complaint had been highlighted "to show the gloss and spin, not necessarily what is false." He argued that "gloss" and "context" can "create falsity." [12]

The pleading of falsity under a "false impression" gloss-and-spin theory of liability is plainly at odds with the mandates of the PSLRA. Under the PSLRA, if plaintiffs allege that defendants made false or misleading statements, they are also required to plead exactly what was false and exactly why it was false. Logically, if the complaint includes a section headed "False and Misleading Statements," plaintiffs must identify each statement within that section that is alleged to be false or misleading. To say, as plaintiffs' counsel ar-

---

12. Although plaintiffs have not cited any authority in support of this "gloss + context = falsity" theory of liability, the court is aware that a few courts have taken this approach. *See, e.g., A.J. Deutscher Family Fund v. Bullard,* 1988 WL 152011*10 (N.D.Cal. Nov. 29, 1988) (" '[e]mphasis and gloss can, in the right circumstances, create liability under both section 11 of the 1933 Act and Rule 10b–5' ") (quoting *Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 203 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)); *Klein v. King,* 1990 WL 61950, *9 (N.D.Cal. Mar. 26, 1990) (citing *Deutscher* for the proposition that "statements that may not be factually inaccurate in and of themselves, but which create a misleading and false impression by their 'gloss and emphasis,' can, in the right circumstances, create liability under both Section 11 and Rule 10b–5"). In *Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir. 1996), the Ninth Circuit held that "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Id.* at 959–60; *see also In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 512 (9th Cir.1991) (" 'Some statements, although liter-

ally accurate, can become, through their context and manner of presentation, devices which mislead investors' ") (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991)). The court notes, however, that all these cases pre-date the effective date of the PSLRA. The court has been unable to locate any cases where the pleading was governed by the PSLRA, in which a court substituted the "gloss and spin" approach for the more rigorous requirements of the PSLRA. Moreover, well before the enactment of the PSLRA, the Ninth Circuit rejected the "overall pattern of deception" approach, in favor of a requirement that the plaintiffs show that particular statements were materially misleading. *In re Apple Computer Sec. Litig.,* 886 F.3d 1109, 1118 (9th Cir.1989). Similarly, in the pre–PSLRA *Convergent* case, the Ninth Circuit noted that "to prevail, the plaintiffs must demonstrate that a *particular* statement, when read in light of all the information then available to the market, or a failure to disclose *particular* information, conveyed a false and misleading impression." *In re Convergent,* 948 F.2d at 512 (emphasis added).

gued at the hearing, that the complaint "should be viewed in its entirety" and that a statement that "may not be false on its face" can be viewed as having "created the gloss," is to turn 180 degrees from the PSLRA's requirement that the complaint *"specify each statement* alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1) (emphasis added). In an "omissions" case, as part of the reason why the statement is misleading, plaintiffs are required to state exactly what information should have been included in order to make the statement not misleading.

■ In either case, for any matter that is plead on information and belief, plaintiffs are required to state with particularity all facts on which such belief is formed. In this case, many of plaintiffs' allegations can be understood only as pled on information and belief, yet they fail to state the underlying facts with particularity. In their opposition to the Harmonic defendants' motion, plaintiffs argue that the complaint satisfies the requirements of the PSLRA by alleging that AT & T informed the Harmonic defendants of their product needs through "weekly order forecasts" that were provided to Harmonic's Director of Materials, Jim Wedellin; and by alleging that Harmonic's Director of Purchasing, Dennis Beaver, first "remarked" at a sales meeting that it was "stupid" for Harmonic to have put all of its eggs in the AT & T basket, and then ordered the sales people to "quickly" get new customers.

However, plaintiffs do not identify the AT & T sources who allegedly communicated with Harmonic concerning AT & T's order status, however, by name or even by job title. They provide no specifics of the "weekly forecasts"—author(s), date prepared, contents—and do not identify the recipients, other than to assert generally that a Harmonic employee named Jim

Wedellin received them. They do not indicate how such information was utilized at Harmonic, or by whom. As for the anecdotal comments of Harmonic employee Dennis Beaver, plaintiffs do not identify the occasion when the comments were made or the audience that heard them; nor do they explain the circumstances or the significance of the comments. Similarly, with regard to the allegations against the C–Cube officers and directors, plaintiffs do not allege any basis for their belief that orders of DiviCom products were declining, or that the C–Cube officers and directors knew but concealed that fact.

■ In addition to the press releases, the "False and Misleading Statements" section cites to numerous analysts' reports, most of which were allegedly prepared following meetings or conference calls between Harmonic "management"—Ley and Dickson are the only individuals identified—and various analysts. Plaintiffs quote from reports issued on January 1, 2000 by CIBC Worldmarket ("CIBC"), SG Cowan Securities, Inc. ("Cowan"), and H.C. Wainright; on March 28, 2000, by Cowan; on April 20, 2000, by CE Unterberg, CIBC, Josephthal and Company ("Josephthal"), Cowen, and UBS Warburg ("Warburg"); on April 28, 2000, by Josephthal; on May 4, 2000, and May 9, 2000, by Cowen; on May 10, 2000, by DLJ Securities; on May 16, 2000, by CIBC; on May 17, 2000, by Warburg and Cowen; on May 22, 2000, by Josephthal; and on June 13, 2000, by Cowen and CIBC.

Defendants in securities fraud suits can be liable for intentional misrepresentations to securities analysts, if the defendants made the false and misleading statements "with the intent that the analysts communicate those statements to the market." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997). Absent such intentional misrepresentations, defendants are liable for

forecasts made by third-party analysts only if the defendants have "put their imprimatur, express or implied, on the projections." *In re Stac*, 89 F.3d at 1410; *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir.1996). Adoption of the forecasts or projections occurs when a defendant has "sufficiently entangled himself with the analysts' forecasts." *In re Syntex*, 95 F.3d at 935 (citation omitted). The complaint "should 1) identify the specific forecasts and name the insider who adopted them, 2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement, and 3) state the dates on which the acts which allegedly gave rise to the entanglement occurred." *Wenger*, 2 F.Supp.2d at 1249 (citation omitted). Merely providing an analyst with historical information is not sufficient for liability under § 10(b) or Rule 10b–5. *In re Caere Sec. Litig.*, 837 F.Supp. 1054, 1059 (N.D.Cal.1993). The complaint must allege a two-way flow of information between the analyst and the insider, such as review and approval of the report by the insider. *See Wenger*, 2 F.Supp.2d at 1249; *see also In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1237 (N.D.Cal.1999).

Plaintiffs' theory of liability—intentional misrepresentation, or adoption and endorsement—is not clear from the complaint. For example, plaintiffs allege that the January 20, 2000, reports by CIBC, Cowen, and H.C. Wainwright, in which analysts from all three organizations raised their revenue and earnings-per-share estimates and "target price" for Harmonic stock, followed a January 19, 2000, conference call in which Ley and Dickson made six specific statements "with the intent that they would be repeated and become part of the total mix of information concerning Harmonic stock." Cplt ¶ 91. The six statements are as follows:

Fiberoptic transport systems (roughly 90% of total sales) were a source of strength again this quarter.

AT & T's (41% of total sales) demand for METROLink transport systems remains strong.

Harmonic shipped 130 multiplexing nodes to AT & T in the second half of 1999 for a trial in Salt Lake City. Harmonic expects to ship multiplexing nodes to several AT & T cities in 2000.

Harmonic expects that AT & T will remain a 40% customer.

Revenue continues to be fueled by strong demand in the domestic market (73% of revenue, up 194% Y/Y) as operators continue to upgrade their networks. The combination with DiviCom should provide a huge boost to the Company's position in the digital market.

Plaintiffs appear to be alleging intentional misrepresentation, but they do not specifically allege that any of these six statements was intentionally *false* or *misleading*. They allege only that "[d]ue to AT & T's overall importance to Harmonic, defendants were aware that a decline in sales to AT & T would have such a negative impact on Harmonic as to make it impossible for the Company to meet future projections." Cplt ¶ 95. But this allegation is surely not disputed, as Harmonic inserted language to that effect in the Form S–4 that it filed with the SEC on March 23, 2000.

Absent a claim of intentional misrepresentation, the complaint must allege adoption or endorsement by the defendants. In this case, however, plaintiffs do not allege that the defendants put their "express or implied" imprimatur on the forecasts made by the analysts the day after the conference call. Rather, the analysts' projections seem to be part of "a one-way flow of information, from [the company's] representatives to analysts and from the

analysts to their customers." *In re Syntex*, 95 F.3d at 934.

The March 28, 2000, analyst report by an unidentified analyst from Cowen was allegedly "based on a meeting with Ley and Dickson in Cannes, France, at the SG Global Tech Conference." Cplt ¶ 101. This report forecast 2Q00 earnings per share of $0.22, and stated that "AT & T business is solid, likely to be down from recent levels but still up 4x. Y/Y; visibility is good for the rest of the year." There is no allegation that defendants adopted or entangled themselves with Cowan's forecast. Plaintiffs claim that, "in truth, by 3/00, Harmonic's orders from AT & T had been drastically reduced." This suggests that plaintiffs are alleging misrepresentations by Ley and Dickson to the unidentified Cowan employee. Plaintiffs provide no information about the content of the alleged conversation in Cannes, however, and do not describe the statements allegedly made by Ley and Dickson. Defendants' liability for misrepresentations depends on their own statements, not those of the analysts. Thus, plaintiffs fail to allege falsity as required by Rule 9(b) and the PSLRA.

In ¶ 108, plaintiffs allege that Ley and Dickson made various statements to analysts during an April 19, 2000, conference call concerning Harmonic's first quarter 2000 results. Plaintiffs list nine statements, including the following:

The strong results were driven by strength in Harmonic's core fiber optic transport business.

Harmonic had shipped its new METROLink product in the quarter and the product was being evaluated by many new customers.

Harmonic's CyberStream products were also experiencing growth.

The CableTV network was upgrading its facilities, which was leading to enormous growth opportunities for Harmonic.

International markets continued to show improvement and would contribute to favorable results going forward.

Sales to AT & T continue to be strong and demand from AT & T would continue as AT & T upgraded its cable infrastructure requiring more METROLink DWDM and PowerBlazer optical nodes.

A pickup in sales to AT & T during 2000 appeared likely.

Plaintiffs provide no indication, however, whether any or all of these statements are false or misleading, and if so, why. Nor do they specify the content of the forecasts allegedly made to the analysts, or identify the specific defendant who made each forecast. They simply follow up this paragraph with ¶ 109, in which they state that CIBC, Josephthal, Cowen, and Warburg repeated this information to the market in analysts' reports which rated Harmonic and forecast increased earnings per share for the second and third quarters of 2000, and which contained either a "buy" rating (CIBC and Josephthal) or a "strong buy" rating (Cowen and Warburg).

In the following paragraph, plaintiffs cite to a report by C.E. Unterberg which provided similar forecasts, and stated, "We believe that AT & T will continue to be Harmonic's largest customer, and we expect AT & T to continue to demand more of the Company's MetroLink DWDM and PowerBlazer optical nodes as AT & T aggressively upgrades its cable infrastructure...." Again, plaintiffs provide no explanation of why these statements are false or misleading or based on false or misleading information, with the possible exception of the statement that Harmonic expected a pickup in sales to AT & T in 2000. In that regard, plaintiffs simply provide the explanation in ¶ 115 (discussed above), that the Harmonic defendants "knew" that AT & T's sales were declining.

In addition, as with the press releases, plaintiffs highlight certain phrases or passages in some of the analysts' reports, but do not explain why the highlighted passages were false. For example, in ¶ 113, plaintiffs quote a long passage from an April 28, 2000, report by a Josephthal analyst, L.M. Harris, entitled "Confident Presentation at Analyst Meeting in New York," and repeating statements made by Ley and Dickson to analysts on April 27, 2000. The quoted passage, which occupies more than a page in the complaint, contains three highlighted passages:

> The **senior management of Harmonic delivered a confident presentation** to analysts in New York on April 27.
> The [acquisition of DiviCom] is expected to be **neutral to slightly accretive** to Harmonic's earnings per share.
> At the analyst meeting, **Harmonic emphasized the synergistic aspects of the merger with DiviCom,** which will marry [Harmonic's technology] with DiviCom's encoding, ATM interface, and statistical multiplexing capabilities.

Plaintiffs do not provide the slightest hint about what is alleged to be false or misleading about the highlighted passages. The first passage, stating that senior management delivered a confident presentation, if true, is either a statement of historical fact or an opinion/critique by the analyst. If it is a false statement—i.e., if senior management did not deliver a confident presentation, the analyst got it wrong, but it certainly does not constitute an actionable statement.

As the court understands the second statement, that the acquisition of DiviCom was expected to be neutral to slightly accretive to Harmonic's earnings per share, it means that Harmonic indicated that it expected the acquisition of DiviCom either to have no effect on its earnings per share, or to slightly increase earnings per share. Either way, plaintiffs have provided no indication of why this projection is false, if indeed it is. Are plaintiffs saying that Harmonic actually expected the acquisition of DiviCom to have a negative effect on its earnings per share?

The third statement simply recounts what happened at the analysts' meeting. Harmonic emphasized the "synergistic aspects" of the merger. In other words, Harmonic emphasized that the merger would result in the combining of production and technology from Harmonic and DiviCom—a not unexpected consequence of a merger between two high-tech companies. "When one company acquires another, it is to be expected that the acquiring company will characterize the acquisition in a positive light. Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve 'synergies' from the combination." *Kane v. Madge Networks N.V.,* 2000 WL 33208116 *3 (N.D.Cal., May 26, 2000).

In addition to failing to clarify the basis of liability and failing to specify the statements alleged to be misleading, the allegations regarding the analysts' reports are deficient because they fail to identify the basis of plaintiffs' information-and-belief pleading. Plaintiffs assert that Ley and Dickson made certain statements to analysts, yet they allege no facts explaining why they believe that the statements they attribute to defendants were actually made by defendants (nor which defendant—Ley or Dickson—made the statements). Plaintiffs also fail to plead in any detail any facts supporting their allegations that internal forecasts prepared by some unspecified person at Harmonic, based on reports provided by some unspecified person at AT & T, indicated that AT & T's sales would continue to decline. They claim that it was "common knowledge" among "former employees" (Cplt ¶¶ 145, 146, 148)

that AT & T sales were falling, but do not identify the employees and do not provide any specifics regarding these alleged communications.

In sum, defendants' motion to dismiss the § 10(b) and § 14 claims must be GRANTED for failure to allege falsity with particularity. Accordingly, the court finds it unnecessary to address the pleading of scienter in any detail. (Moreover, the court must consider the complaint in its entirety in order to determine whether plaintiffs have adequately pled scienter, *see Silicon Graphics,* 183 F.3d at 985, and that will not be possible until after plaintiffs have amended the complaint.) Thus, the court does not rule on the sufficiency of plaintiffs' allegation that scienter can be inferred from the fact that a number of Harmonic and C–Cube officers and directors sold large blocks of stock prior to the release of the 2Q00 results.[13]

■ The court does find, however, that plaintiffs' vague and unsubstantiated allegations of conversations and internal reports relating to alleged problems with both Harmonic and DiviCom are not sufficient to give rise to a strong inference of deliberate recklessness. As the Ninth Circuit held in *Silicon Graphics,* the PSLRA requires that plaintiffs identify the sources from which they obtained such information, and that they allege the specific content of documents on which they rely, identifying who prepared them and who reviewed them. *Id.* at 984. Plaintiffs provide no particulars concerning their claims that defendants had communications with AT & T regarding AT & T's excessive

inventories—the complaint is silent with regard to the time, place, and contents of any such communications, and with regard to the identity of the participants in said communications. Nor do plaintiffs allege facts sufficient to give rise to an inference that the C–Cube defendants knew that any statements attributed to them were false when made—in particular, that the C–Cube board did not genuinely believe its recommendation in favor of the merger at the time the proxy solicitation was issued and filed with the registration statement.

Moreover, because the allegations of the complaint fail to meet the "deliberate recklessness" standard, the court does not reach the issue of whether defendants' statements were forward-looking, and hence whether they meet the "actual knowledge" standard or whether they were accompanied by adequate and meaningful cautionary language. *See In re Vantive,* 110 F.Supp.2d at 1215.

Finally, the court finds that the motion to dismiss the § 20 claim must be GRANTED because plaintiffs have not alleged sufficient facts to support a claim of primary liability under § 10(b) or Rule 10b–5.

### 2. C–Cube Microsystems' Motion to Dismiss

■ Plaintiffs allege the third and fourth causes of action against C–Cube Microsystems, Inc. C–Cube moves to dismiss the § 14 claim on the basis that it did not exist as a corporation before the merger and could not have made any false

---

**13.** Allegations that a corporate insider presented materially false information, or delayed disclosing materially adverse information, in order to sell his or her personally-held stock at a large profit, may support a strong inference of scienter. *In re PETsMART, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 999 (D.Ariz. 1999). But the mere existence of stock sales does not raise a strong inference of fraudulent

intent. "[T]o rely on insider trading as circumstantial evidence of falsity, [plaintiffs] must allege sufficient context of insider trading for us to determine whether the level of trading is 'dramatically out of line with prior trading practices.'" *Ronconi v. Larkin,* 253 F.3d 423, 2001 WL 609520*9 (9th Cir. June 6, 2001).

statements in connection with the proxy solicitation. C–Cube also moves to dismiss the § 10 claim on the basis that plaintiffs do not allege that new C–Cube made false statements after the merger.

Plaintiffs respond that new C–Cube is liable because it is managed and controlled by essentially the same officers and directors as old C–Cube. Plaintiffs contend that new C–Cube "is directly liable because of its substantial participation in the statements at issue and because it is an alter ego of the former C–Cube." Plaintiffs also claim that new C–Cube is liable "as a control person and as a respondeat superior."

The court finds that C–Cube's motion should be GRANTED on the basis that the complaint does not allege that new C–Cube drafted, prepared, reviewed, or edited any of the challenged public statements. There can be no liability under § 10(b) unless the defendant made a false or misleading statement. Moreover, plaintiffs have not pled alter ego liability, nor have they pled any facts to show that new C–Cube controlled old C–Cube.

C.  Leave to Amend

The complaint is dismissed with leave to amend in conformity with Rule 9(b) and the PSLRA. To reiterate, with regard to alleging falsity, Rule 9(b) requires that "the statement of the claim ... aver with particularity the circumstances constituting the fraud." *GlenFed,* 42 F.3d at 1545. This means that a complaint must allege more than the neutral facts—the time, place, and content of an alleged misrepresentation—necessary to identify the transaction. "The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement complained of was false or misleading." *Id.* at 1548. Plaintiffs shall amend the § 11 and § 12 claims

to allege with particularity that the defendants made false or misleading statements in the registration statement and in the prospectus, in accordance with the requirements of Rule 9(b).

Under the PSLRA, plaintiffs are required to specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and, if an allegation regarding a false or misleading statement or an omission is made on information and belief, state "in great detail, all the relevant facts forming the basis of [their] belief." *Silicon Graphics,* 183 F.3d at 985.

The PSLRA also requires that the complaint shall, with respect to each alleged unlawful act or omission, state "with particularity" facts giving rise to a strong inference that the defendant acted with the required state of mind. Under Ninth Circuit law, this means that the complaint must allege facts that "create a strong inference of, at a minimum, *'deliberate or conscious recklessness.'* " *Id.,* at 979 (emphasis added). In other words, it is no longer sufficient for plaintiffs to allege intent in terms of mere "motive and opportunity" or simple "recklessness." *Id.; see also id.* at 985 (it is not enough for a plaintiff to state facts giving rise to a "mere speculative inference" of deliberate recklessness, or even "a reasonable inference" of deliberate recklessness.)

Plaintiffs shall amend the § 14(a), Rule 14a–9, § 10(a), and Rule 10b–5 claims in conformity with the requirements of the PSLRA, as follows. Separately, for *each* alleged false or misleading statement, plaintiffs shall

1.  State the false or misleading statement.

2.  State whether the statement was written or oral;

a. If the statement was written, identify the document in which it appeared—that is, provide the title and author of the document, the date it was prepared, and, if not a publicly-available document, name of the person or persons who reviewed it;

b. If the statement was oral, state when and under what circumstances the statement was made, and by whom; if allegation regarding an oral statement is not made on personal knowledge, state with particularity all facts upon which plaintiffs formed the belief that one or more of the defendants made the statement at the time and place at which it is alleged to have been made.

3. State why the statement was false or misleading at the time it was made, and state with particularity all facts upon which plaintiffs formed the belief that the statement was false or misleading;

a. If plaintiffs allege that the falsity of the statement is shown by conflicting information in internal reports, identify the report (title, author, date prepared, recipient(s)) and indicate the portion of the report that contradicts the false or misleading statement;

b. If plaintiffs allege that the falsity of the statement is shown by contemporaneous information inconsistent with a particular statement, state with particularity what the contemporaneous information was, what the source of the information was, who had the information, and how plaintiffs learned of the information.

4. State particular facts giving rise to a strong inference of the required mental state. For § 14(a) and Rule 14a–9 claims, the required state of mind is negligence. For § 10(b) and Rule 10b–5 claims, the required state of mind is a degree of recklessness that strongly suggests actual intent to deceive;

a. If plaintiffs allege that defendants received or possessed documents or information that was at odds with the alleged false or misleading statement, state all the relevant facts supporting this belief;

b. If plaintiffs allege that the information was contained in documents, state the title, date, and contents of such documents (with particularity), the identity of the person or persons who drafted such documents, the identity of the person or persons who reviewed such documents, how plaintiffs learned of the existence of the documents, and how plaintiffs know that defendants received these documents;

c. If plaintiffs allege that the information was in a form other than written, state the source or sources of their information (how they learned of this information allegedly possessed by defendants) and how they know that the defendants possessed this information.

5. If plaintiffs allege that forward-looking statements attributed to defendants were false and misleading, plaintiffs must allege materiality, lack of meaningful cautionary language, and actual knowledge of the speaker.

6. If plaintiffs do not intend to allege that any of the statements attributed to defendants were false, they must state that intention clearly. If plaintiffs allege that the statements attributed to defendants were misleading only by virtue of the fact that they omitted to state additional present facts, they must state that clearly. They must also state with particularity the material fact or facts that are necessary in order to make the statements made, in light of the circumstances under which they were made, not false or misleading.

## CONCLUSION

In accordance with the foregoing, defendants' motions to dismiss the complaint for failure to state a claim are GRANTED.

The Second Consolidated Amended Complaint shall be filed no later than August 13, 2001. Any motions to dismiss shall be filed and served no later than September 19, 2001; the opposition to the motions shall be filed and served no later than October 17, 2001; and any reply to the opposition shall be filed and served no later than October 31, 2001. The court will advise the parties thereafter if a hearing is necessary.

This order fully adjudicates the motions listed at Nos. 57, 58, and 61 on the clerk's docket for this case.

**IT IS SO ORDERED.**